**ALLIANCE TO END REPRESSION, et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**AMERICAN CIVIL LIBERTIES UNION, et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

Nos. 74 C 3268, 75 C 3295.

United States District Court, N. D. Illinois, E. D.

Aug. 11, 1981.

William Quinlan, Corp. Counsel, Peter Fitzpatrick, Chicago, Ill., Gregory C. Jones, Edward J. Moran, Asst. U.S. Attys., Chicago, Ill., J. Charles Kruse, Washington, D.C., Lawrence Suffredin, Jr., Robert C. Christenson, George Murtaugh, Jr., Thomas Royce, Albert Brooks Friedman, Ltd., Chicago, Ill., for defendants.

Richard M. Gutman, Douglass W. Cassel, Jr., Joseph R. Lundy, Schiff, Hardin & Waite, Matthew J. Piers, John H. Mathias, Jr., Jenner & Block, Sybille C. Fritzsche, Lawyers Committee, Lance Haddix, Robert C. Howard, Pressman & Hartunian, Chicago, Ill., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

These cases are before the court for approval of proposed settlements of plaintiffs' claims against the Federal Bureau of Investigation ("FBI"), the Justice Department, the Central Intelligence Agency ("CIA"), and certain individual defendants. There are two separate settlement agreements, one of which will be referred to as the FBI agreement and the other as the CIA agreement. The FBI agreement includes claims asserted against the FBI, United States Department of Justice, Attorney General, the Director of the FBI and two former employees of the FBI. The CIA agreement includes claims asserted against the CIA and its Director. In this opinion the defendants who are settling are sometimes referred to as the "settling defendants" or the "federal defendants."

The court previously determined that the proposed settlements were within a range of possible settlement and directed that notice of a hearing on the proposed settlements be given to the plaintiff class. Notice was given and a hearing was held on February 13, 1981. Proposed findings of fact and conclusions of law were submitted by the proponents of the settlement; objections thereto were filed by certain objectors; and supplemental materials and proposed findings and conclusions were submitted to the court. The record was closed on June 11, 1981.

The court has decided to approve the proposed settlements and adopt, with only minor changes, the proponents' proposed findings and conclusions. The proponents' proposed findings and conclusions clearly and accurately state the relevant facts and legal principles and, in fact, were impossible to substantially improve.

Plaintiffs have now also entered into settlement agreements with the remaining defendants, principally the City of Chicago, the Secretary of Defense, and various former military intelligence personnel. A preliminary determination of fairness has been made and a hearing on the fairness of the proposed settlements is set for October 9, 1981.

## FINDINGS OF FACT

### THE CASES

Alliance to End Repression ("Alliance"), et al. v. City of Chicago, et al., No. 74 C 3268, was filed as a class action on November 13, 1974. American Civil Liberties Union ("ACLU"), et al. v. City of Chicago, et al., No. 75 C 3295, was filed as a class action on October 3, 1975.

### PARTIES

The 32 Alliance named plaintiffs, of whom 14 are organizations and 18 are individuals, include churches, political groups, civil liberties organizations, and individual political community, and religious activists.

Initial Alliance defendants included officials and employees of the City of Chicago and the Chicago Police Department. The City of Chicago was added as an Alliance defendant on November 19, 1979.

On July 8, 1977, Alliance plaintiffs added as defendants, in their official capacities only, certain federal officials, including the Attorney General, the Director of the FBI, the Director of the CIA, and the Secretary of Defense. On January 28, 1980, Alliance plaintiffs added as defendants the United States Department of Justice, the Federal Bureau of Investigation, and the Central Intelligence Agency.

The 24 ACLU named plaintiffs, of whom 10 are organizations and 14 are individuals, include community groups, religious groups, civil rights and civil liberties groups, and individual community activists, lawyers, journalists and public officials.

Initial ACLU defendants included the City of Chicago and various city officials, the Attorney General of the United States

and various FBI officials, and the Secretary of Defense and various former military personnel.

On December 27, 1979, ACLU plaintiffs added as defendants the United States Department of Justice and the Federal Bureau of Investigation.

### JURISDICTION

Jurisdiction in these cases is asserted on the basis of 28 U.S.C. §§ 1331 and 1343, 18 U.S.C. § 2520, and 5 U.S.C. § 552a; and declaratory relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

### CLAIMS

Plaintiffs in both cases claim that the settling defendants have conducted surveillance of, and compiled dossiers on, their lawful political and other lawful activities; gathered information about plaintiffs by unlawful means, including warrantless wiretaps and break-ins, unlawful use of infiltrators and informers, and by other unlawful means; disrupted and harassed plaintiffs' lawful activities; and further, that defendants have also committed these alleged wrongs against members of the plaintiff classes, all as part of a continuing course and pattern of alleged illegal conduct.

Plaintiffs claim that this alleged conduct violates their rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, 18 U.S.C. §§ 2510–20, and 5 U.S.C. § 552a.

The relief asked for on behalf of the named plaintiffs and plaintiff classes in both cases includes a declaration by the court that the conduct complained of is unconstitutional, and an injunction prohibiting the continuation of such conduct.

No damages are sought on behalf of the plaintiff classes in either case. Certain of the named plaintiffs ask for monetary damages against certain of the defendants.

In both lawsuits the settling defendants denied all allegations of unlawful government intrusions.

No findings of fact have been made by the Court relating to the allegations made against the settling defendants.

## HISTORY OF LITIGATION

Both cases have been actively litigated and sharply contested throughout the years since they were filed.

## MOTIONS TO DISMISS

Federal defendants' motion to dismiss in the *Alliance* case was denied November 15, 1977. Federal defendants' motion to strike portions of the *Alliance* plaintiffs' Second Amended Complaint, adding federal agencies as defendants and alleging violations of the Privacy Act, 5 U.S.C. § 552a, was denied March 28, 1980.

A motion to dismiss by the federal defendants in the *ACLU* case was denied May 26, 1976. 431 F.Supp. 25.

## CLASS CERTIFICATIONS

On March 25, 1976, the Court certified the following two plaintiff classes in the *Alliance* case:

(a) The plaintiff individuals.

The class represented by plaintiff individuals consists of all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage in or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

(b) The plaintiff organizations.

The class represented by plaintiff organizations consists of all organizations located or operating in the City of Chicago who engage in or have engaged in lawful politi-cal, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

On May 24, 1976, the Court certified the following two plaintiff classes in the *ACLU* case:

(a) The plaintiff individuals.

The class represented by plaintiff individuals consists of all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage in or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents.

(b) Plaintiff organizations.

The class represented by plaintiff organizations consists of all organizations located or operating in the City of Chicago who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents.

On appeal by the federal defendants, the class certifications in both cases were affirmed by the Court of Appeals on November 22, 1977, and rehearing and rehearing *en banc* were denied February 13, 1978. 565 F.2d 975.

The *Alliance* and *ACLU* cases were consolidated for discovery purposes on July 2,

1976, and both cases were consolidated for discovery purposes on December 8, 1976 with *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. City of Chicago, et al.*, No. 76 C 1982, which is not a class action, and which does not involve the federal defendants or the proposed settlements.[1]

## DISCOVERY AGAINST FBI AND JUSTICE DEPARTMENT DEFENDANTS

Many of plaintiffs' discovery requests were vigorously resisted by the FBI and Justice Department defendants throughout the litigation on numerous grounds, principally relevance, opposition to class-wide discovery, burden and privileges including the informer's privilege and claims of "state secrets." *E. g.* 75 F.R.D. 441 (June 7, 1977); 609 F.2d 277 (7th Cir. 1979), 619 F.2d 1170 (7th Cir. 1980) (upon rehearing *en banc*, remanding in part for further consideration.) The defendants' claim of informer's privilege was litigated extensively, overruled twice (75 F.R.D. at 445–46; Mem. Op. and Order of March 13, 1979), reconsidered twice, and ultimately not resolved. The Court's Decision of April 18, 1980, ruled disclosure of informers "not yet appropriate" (p. 4) and suggested "exploring the settlement of this issue." (p. 7).

The Court's orders ultimately resulted in the production of massive discovery concerning FBI domestic intelligence activities in Chicago. Throughout most of the period from mid-1977 through late 1980, FBI files and documents were produced to plaintiffs at a rate substantially in excess of 1000 pages per week. Despite numerous deletions, mainly on the ground of the informer's privilege and "state secrets" privilege, these files cumulatively totalled several hundred thousand pages, and reflect an extensive cross-section of FBI domestic intelligence activities in Chicago during the period 1940 through 1980. They include:

1. The Chicago Lawyers' Committee case was settled earlier this year, at the same time the plaintiff classes in these cases entered into settlement agreements with the City of Chicago

(a) All Chicago Field Office and Headquarters files on all *ACLU* named plaintiffs, and on all but two *Alliance* named plaintiffs. (With respect to these two, all Chicago Field Office files concerning FBI activities since 1972 and 1974, respectively, were produced.) The Chicago Field Office files on *ACLU* named plaintiffs alone, counting only the period since January 1, 1966, amount to approximately 15,000 pages.

(b) Every one-hundredth Chicago Field Office file opened in FBI file classifications "100" ("subversive") and "157" ("extremist"), and in 11 other file classifications regarded by the FBI as "security-related," since January 1, 1966. These include approximately 143 "subversive" files, 103 "extremist" files, and 65 files in 9 additional file classifications, including classifications 14 (sedition), 65 (espionage) and 176 (anti-riot).

(c) Every five-hundredth Chicago Field Office file opened in the same classifications prior to January 1, 1966. These include approximately 85 "subversive" files, and approximately 36 files in the other classifications.

(d) Approximately 75 additional files on class members designated by plaintiffs, including approximately 25 organizations and 50 individuals. These include a broad cross-section of files on civil rights, anti-war, political and civic groups; labor unions; the women's liberation and gay liberation movements; and individual civic, community and political activists.

(e) All or portions of the Chicago Field Office files on approximately 25 individuals whose "subversive" or "extremist" files were on a list of investigations purportedly closed pursuant to FBI directives implementing the 1976 Attorney General's Guidelines for Domestic Security Investigations.

(f) The Chicago Field Office informant files, totalling several thousand pages, and all other defendants in this case who are not included in the FBI and CIA settlement agreements.

with virtually no deletions, on four FBI domestic security informants identified by plaintiffs, whose periods of principal activity for the FBI covered, respectively, 1966–69, 1971–76, 1971–78 and 1975–1978.

(g) The Chicago Field Office files on the COINTELPRO programs targeted at the Communist Party, Socialist Workers Party, "White Hate", "New Left", and "Black Extremist" groups, as well as portions of Headquarters files on these programs.

(h) Voluminous Headquarters and Field Office files on FBI domestic intelligence policies and practices. These include manuals; handbooks; FBI "control" files incorporating policy documents relating to each file classification; "SAC letters" (periodic Headquarters instructions to the field); reports of FBI inspections of the Chicago Field Office and the Headquarters divisions and sections responsible for domestic security; files of policy documents relating to particular investigative techniques, such as "black bag jobs", electronic surveillance, informers, photographic surveillance, mail covers, mail opening, trash covers, obtaining tax records, and other techniques; policy files on dissemination and destruction of files; policy files on standards and procedures under the various Attorney General's Guidelines and Executive Orders promulgated during 1976–1980; files on indexing policies; FBI liaison files with other intelligence agencies, including the Chicago police, the military and the CIA; "COINTELPRO" policies; various statistics on the numbers of FBI investigations and informers in various categories, at both the Chicago and Headquarters levels; FBI budget information; public statements and congressional testimony by FBI officials; various FBI indices, including the "Security Index"; and other policy documents.

(i) FBI publications evidencing dissemination of domestic security information (such as the "FBI Summary of Extremist Activities.")

(j) Files on the authorization, continuation and closing of specific domestic security wiretaps in Chicago.

(k) FBI Interrogatory answers stating that Chicago Field Office files on the *ACLU* named plaintiffs since January 1, 1966, contain the names of 837 FBI informants, and a June 16, 1978 stipulation between *ACLU* plaintiffs and federal defendants, for all purposes in this litigation, that none of these informants reported on any activities of the named plaintiffs which the federal defendants claim were unlawful, and that all of them provided information to the FBI concerning plaintiffs' lawful activities, views or beliefs.

(l) Other information in miscellaneous categories.

Plaintiffs also obtained numerous interrogatory answers, and deposed numerous FBI agents and officials including case agents, field supervisors, the Special Agent in Charge of the Chicago Field Office, Headquarters officials in charge of domestic security investigations nationwide, and the second-ranking official in the FBI, as well as a Justice Department official responsible for overseeing FBI compliance with relevant Attorney General Guidelines. Relevant portions of FBI personnel files pertaining to many of the FBI deponents were also produced.

On October 14, 1976, to protect the privacy of individuals and organizations reported on by the FBI in these files, the Court entered a protective order limiting dissemination of information obtained in discovery. 75 F.R.D. 431.

## DISCOVERY AGAINST CIA

As part of pretrial discovery, plaintiffs received hundreds of pages of CIA documents including the following:

(a) CIA documents concerning the CIA's relationship with the Chicago Police Department.

(b) The CIA files on 30 of the 32 named plaintiffs. (The CIA had previously furnished named plaintiffs Socialist Workers Party and Young Socialist Alliance their CIA files in *Socialist Workers Party v. Attorney General*, 73 Civ. 316 (S.D.N.Y.).)

(c) The CIA files on plaintiffs' counsel.

During pretrial discovery, plaintiffs did not receive any documentation of CIA surveillance after 1973 of lawful First Amendment activity in Chicago.

## OTHER INFORMATION

In negotiating and deciding whether to enter into the proposed FBI settlement, plaintiffs have also had the benefit of extensive additional information concerning FBI and CIA domestic intelligence policies and practices, including FBI and CIA files obtained in other lawsuits and under the Freedom of Information Act, and numerous congressional hearings and investigations.[2]

## THE SETTLEMENT AGREEMENTS

The settlement agreements contain specific agreements with respect to future CIA and FBI activities in Chicago. Because of the importance of these specific agreements, the Court has attached to this Memorandum Opinion and Order, as Exhibits A and B, respectively, copies of the relevant portions of the FBI agreement and the CIA agreement.

The FBI settlement would terminate all claims that plaintiffs have asserted in these actions against the United States Department of Justice, the Federal Bureau of Investigation, the Attorney General, the Director of the FBI, and two former employees of the FBI. The CIA agreement would terminate all claims plaintiffs have asserted against the CIA and its Director.

The proposed settlements are the result of a negotiating process described by counsel for both sides as arduous, adversary and lasting nearly a year, in which counsel for all named plaintiffs and for all settling defendants participated.

Counsel for all parties agree that nearly every line and paragraph of the agreements, and in many cases individual words, are the product of intense negotiations, and that the agreements reflect compromise by all parties.

There is no evidence that the negotiations were other than adverse. On the contrary, the whole history of these lawsuits is one of vigorous, hotly contested litigation. Significant discovery and trial preparation continued throughout the period of negotiations. At one point, late in the negotiations, an impasse between counsel was reached, but was resolved after a meeting between client representatives, attended also by *ACLU* plaintiffs' expert witnesses, Dr. Morton H. Halperin and Jerry J. Berman.

The settlements were entered into after sufficient facts were developed, through discovery and otherwise, fairly to apprise all parties of the facts likely to be adduced at trial and to enable them fairly to assess the likely outcome of trial. Massive pretrial discovery was substantially complete, and pursuant to court order plaintiffs had completed and filed their draft final pretrial materials. Late in 1980 the Court set the cases for trial in March of 1981. Although this trial date was stricken when the cases were reassigned to a newly-appointed judge, it was clear that the cases would have been tried in 1981 but for the proposed settlements.

Counsel for the participating parties state that the agreements negotiated by them, in their considered opinion, are fair, reasona-

2. E. g., Final Report of the Select Committee to Study Governmental Operations With Respect to Intelligence Activities, United States Senate, 94th Cong., 2d sess. Report No. 94–755, April 23, 1976; General Accounting Office reports No. GGD–76–50, February 24, 1976, "FBI Domestic Intelligence Operations—Their Purpose and Scope: Issues That Need to Be Resolved," and No. GGD–78–10, November 9, 1977, "FBI Domestic Intelligence Operations: An Uncertain Future"; Hearings Before the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary, United States Senate, 95th Congress, 2d sess., especially part 2, pp. 91–129 (1978); Hearings Before the Committee on the Judiciary, United States Senate, 96th Cong., 1st sess., Serial No. 96–53, Part 1, "FBI Charter Act of 1979, S. 1612" (1980); Report to the President by the Commission on CIA Activities Within the United States, June 1975 (Washington, D.C.: U.S. Government Printing Office); and "CIA Intelligence Collection About Americans: CHAOS Program and the Office of Security", pp. 679–732.

ble and adequate. At the March 13, 1981 hearing on the settlement, the Court expressed high regard for the competence of counsel for the participating named plaintiffs. (Tr., at p. 25)

The FBI agreement was approved by all *ACLU* named plaintiffs and by all *Alliance* named plaintiffs except two organizations (Socialist Workers Party and Young Socialist Alliance) and three individuals (Dennis Cunningham, Jeffrey Haas and G. Flint Taylor), all five of whom voluntarily dismissed with prejudice their claims against the FBI and Department of Justice defendants on December 22, 1980. The two organizations did, however, reserve their claims against the FBI in certain other litigations. On February 11, 1981, two additional *Alliance* named plaintiffs (Young Workers Liberation League and Jay Schaffner) also withdrew from the settlement and voluntarily dismissed with prejudice their claims against the FBI and Department of Justice defendants.

The FBI agreement has also been approved by the FBI and by the United States Department of Justice, and has been personally approved by the present FBI Director, William Webster, and by senior officials of the Department of Justice, in their official capacities.

The CIA settlement has been approved by all named plaintiffs except for the Socialist Workers Party and the Young Socialist Alliance, both of which voluntarily dismissed with prejudice their claims asserted in this action against the CIA defendants, but without prejudice to their pending claims in *SWP, et al. v. Attorney General, et al.,* No. 73 Civ. 3160 (TPG) (S.D.N.Y.).

The CIA settlement has also been approved by the CIA and personally approved by appropriate officials of the CIA and senior officials of the Department of Justice, in their official capacities.

It is very likely that further litigation, absent the proposed settlements, would be extremely complex, lengthy and expensive.

## THE PRELIMINARY HEARING

In December of 1980 the proponents of the settlements jointly moved to have the Court establish procedures for approval of the settlements. On December 30, 1980, the Court held a preliminary hearing on the proposed settlements, after which it found in its Order of the same date that the proposed settlements were within the range of possible approval and that there was probable cause to notify members of the plaintiff classes of the proposed settlements pursuant to Rule 23(e), Federal Rules of Civil Procedure, and to hold a fairness hearing.

Prior to the preliminary hearing, the Court reviewed the settlement agreements and the proposed notice to class members, which had been filed with the Court on December 22, 1980.

At the preliminary hearing, the Court heard from counsel for the proponents of the settlements, all of whom, orally at the hearing and in their joint motions filed beforehand, urged approval of the proposed settlements.

At the preliminary hearing the Court also heard from counsel for nonparticipating *Alliance* named plaintiffs, Socialist Workers Party and Young Socialist Alliance, concerning the reasons for their nonparticipation in the proposed FBI settlement. Prior to the hearing the Court had received in writing the views of *Alliance* named plaintiffs Cunningham, Haas, and Taylor, explaining why they had chosen not to participate in the proposed FBI settlement. The preliminary hearing was attended on their behalf by an attorney from the same law office as these three plaintiffs, all of whom are attorneys.

The Courts' questions and suggestions at the hearing resulted in a number of changes in the parties' proposed form of notice to class members, including clarifications of the status of the litigation with respect to those defendants not joining in the settlements; the fact that no damage claims on behalf of plaintiff class members had been alleged in the cases, and accordingly none were affected by the proposed settlements;

and a summary of the criticisms of the proposed settlements by the nonparticipating *Alliance* named plaintiffs.

At the Court's suggestion, the wording of the summary of these criticisms was negotiated and agreed upon immediately following the preliminary hearing, by counsel for the proponents (*ACLU* named plaintiffs, *Alliance* named plaintiffs, and the federal defendants), counsel for the Socialist Workers Party and Young Socialist Alliance, and counsel for *Alliance* plaintiffs Cunningham, Haas, and Taylor.

Following the hearing, that same day, the Court found that the form of notice to class members, as thus amended (Appendix B hereto) was fair and adequate, directed that notice be given in a prescribed manner, and scheduled a fairness hearing for February 13, 1981.

### NOTICE TO CLASS MEMBERS

■ The Court ordered that individual notice by first-class mail be mailed not later than January 23, 1981 to all members of the plaintiff classes who could be identified and located through reasonable effort. The Court found that such reasonable effort included the following:

(a) Individual notice by first-class mail to each organization located in the City of Chicago on which the FBI or CIA maintains or maintained an intelligence file which has been produced in whole or in part to plaintiffs during discovery in these actions;

(b) Individual notice to all members of the organizations referred to in (a) above, to be accomplished by requesting the officers or other responsible persons in the organization to notify the organization's members of the contents of the notice; and

(c) Individual notice by first-class mail to all other plaintiff class members whose names and current addresses are known to plaintiffs.

The Court also found that notice by publication was the most reasonable form of notice to those class members not notified pursuant to the provisions listed above, and ordered that such notice by publication be given not later than January 15, 1981 on three consecutive days in two daily newspapers of general circulation in the Chicago metropolitan area.

The Court ordered, and the mailed and published notices advised, that "[a]ny person who believes that he or she is a member of any of the plaintiff classes, and any organization which believes itself to be a member of any of the plaintiff classes, may appear at the hearing in person or through an attorney and present his, her, or its views on the proposed settlements," if they complied with certain minimal procedural requirements.

The requirements established in the December 30, 1980 Order regarding notice to class members were satisfied. Between January 8 and January 23, 1981, more than 69,000 notices were mailed by first class mail to persons and organizations in or possibly in the plaintiff classes.

The notices to plaintiff class member organizations and to their mailing lists likely reached the great majority of individual plaintiff class members, because the overwhelming majority of such individuals were investigated or surveilled because of their affiliation with an organization. In a sampling, the General Accounting Office found that approximately 92% of FBI Chicago Field Office domestic intelligence cases on individuals were based on their affiliations with organizations suspected of being "subversive" or "extremist" by the FBI. (Report No. GGD–76–50, *supra*.)

The total of approximately 69,000 notices is a satisfactory number in the circumstances of this settlement. While the total number of plaintiff class members cannot be specified with certainty, the FBI Chicago Field Office has opened approximately 57,000 "subversive" files and approximately 11,000 "extremist" files, for a total of approximately 68,000 persons in the FBI file classifications most relevant to the plaintiff classes.

With respect to the three plaintiff class members who later objected that they did

not receive notice sufficiently in advance of the fairness hearing:

(a) Notice was mailed to the Industrial Workers of the World on January 12, 1981. *ACLU* plaintiffs' counsel discussed the notice and the February 13 hearing with their General Secretary-Treasurer, to whose Chicago address the notice had been mailed, on January 13, 1981.

(b) The National Director of the Veterans Coalition telephoned *ACLU* plaintiffs' counsel about the notice on January 15, 1981, stating that the Coalition had seen the notice in the newspapers (which printed the notice on January 13, 14, and 15, 1981).

(c) The record does not reflect when Mr. Hugh Wilson received the notice. However, his counsel, Ms. Donna Marie Gilligan, is also the attorney for the Socialist Workers Party, and she knew about the February 13 hearing since at least early January, 1981, and possibly earlier.

## THE FAIRNESS HEARING

On February 13, 1981, the Court conducted a hearing on whether the proposed FBI settlement is fair, reasonable and adequate, and should be approved by the Court. The hearing lasted all day and was attended by more than two hundred persons.

At the hearing, in addition to oral presentations by counsel who signed the settlement and by four representatives of the *Alliance* and *ACLU* named plaintiffs speaking in favor of the proposed FBI settlement, the Court heard oral presentations from 23 persons, some of whom were counsel, and most of whom objected to or criticized the proposed FBI settlement. All persons who had satisfied the minimal procedural requirements specified in the Notice and who were present at the hearing were given an opportunity to be heard.

Evidence introduced at the hearing included the testimony of two expert witnesses, Dr. Morton H. Halperin and Jerry J. Berman, called by *ACLU* plaintiffs in support of the FBI settlement; cross-examination of Dr. Halperin by one of the counsel

for objecting class members; and voluminous documentary exhibits offered by counsel for nonparticipating *Alliance* named plaintiffs Socialist Workers Party and Young Socialist Alliance.

In addition, the Court received 26 written statements of views by persons and organizations who did not appear at the hearing, most expressing objections to or criticisms of the proposed FBI settlement; written statements by 23 additional persons adopting the written statement filed by nonparticipating *Alliance* plaintiffs Cunningham, Taylor and Haas; written notices by 23 additional persons stating their intention to appear at the fairness hearing, but who did not in fact appear; an affidavit of Dr. Halperin summarizing his testimony; and stipulations of dismissal of claims against the FBI and Justice Department defendants, by the Communist Party, U.S.A., Young Workers Liberation League, Jay Schaffner, and National Lawyers Guild, all dated February 11, 1981; and by the Chicago Alliance Against Racist and Political Repression, dated February 12, 1981.

The credentials presented by Dr. Halperin and Mr. Berman qualify them as expert witnesses in these cases on matters relating to the impact on civil liberties and privacy of FBI and CIA domestic intelligence and national security investigative practices, and establish that their relevant writings, testimony before numerous congressional committees, and litigation efforts have been sharply critical of such practices and strongly supportive of civil liberties.

Both Dr. Halperin and Mr. Berman have followed the progress of these cases over a period of years; are generally familiar with the allegations and the evidence; have carefully studied the proposed settlements; reviewed prior drafts of the agreements and advised plaintiffs concerning them; and participated in a meeting in which representatives of plaintiffs met with FBI and Justice Department officials in an effort to break an impasse in the negotiations.

Both witnesses testified that in their opinion the proposed settlements are fair,

reasonable and adequate. For example, Dr. Halperin testified, "My opinion is that there is not the slightest doubt that this [FBI] settlement meets that standard; in my view goes substantially beyond that." (Tr. at 7.) Mr. Berman similarly testified, "My opinion is that it is a fair and adequate settlement, and that is a major step forward in control of the activity of a federal agency engaged in domestic security investigations which impinge on the First Amendment activity." (Tr. at 26–27.)

The exhibits introduced at the hearing by the Socialist Workers Party and Young Socialist Alliance tend to support two basic allegations:

(a) that the United States Department of Justice and the FBI, as defendants in the pending case of *Socialist Workers Party, et al. v. The Attorney General, et al.*, 73 Civ. 3160 (TPG), S.D.N.Y., apparently assert that they are not prohibited by the Constitution and the laws from engaging in certain practices, including investigations based on lawful political activity, which are not permitted by the terms of the proposed FBI settlement in these Chicago cases; and

(b) that the FBI allegedly continues currently to investigate and harass the Socialist Workers Party, Young Socialist Alliance, and their members, in a variety of ways (although the exhibits contain no evidence concerning such activities in Chicago).

The Socialist Workers Party and Young Socialist Alliance remain free to litigate any factual and legal issued presented by these claims in their pending New York litigation. The stipulation dismissing their claims against the FBI and Justice Department defendants in the Chicago litigation, dated December 22, 1980, provides, in pertinent part:

The dismissal of these claims in this action is with prejudice except that it is expressly understood that this dismissal shall not prejudice the claims that the Socialist Workers Party and Young Socialist Alliance are litigating in [their New York lawsuit.]

At the close of the February 13 hearing, the Court continued the matter until March 13, and directed the federal defendants to indicate by that date by letter whether they agreed or disagreed with the understandings of the proposed FBI settlement expressed in the testimony of Dr. Halperin and Mr. Berman.[3] The Court also invited all objecting parties to file whatever motions they deemed appropriate, and to supplement their views in writing if they so desired, prior to the March 13 date.

No such motions were received by the Court prior to March 13. However, on March 13 counsel for the Socialist Workers Party and the Young Socialist Alliance moved to reopen the record. This motion was granted only insofar as it sought leave to file additional documents but denied insofar as it sought leave to call additional witnesses.

On March 12, 1981 the federal defendants delivered to the Court their letter of that date, responding to the Court's directive. The letter states federal defendants' belief that the interpretations of the FBI agreement by Dr. Halperin and Mr. Berman are "generally consistent" with federal defendants' interpretation, and also clarified federal defendants' understanding on three particular points. Counsel for both *ACLU* plaintiffs and federal defendants then emphasized their joint position that what they have agreed to is the language of the settlement, recognizing that they would not necessarily agree on all possible questions of interpretation which might arise in abstract or hypothetical situations. In particular, *ACLU* plaintiffs' counsel stated that *ACLU* plaintiffs do not necessarily agree with the abstract applications that might be inferred or suggested from the government's letter. Counsel for objecting parties were then given ten days to respond to the government's letter.

3. This procedure was adopted by the Court in response to certain of the objectors' demands that the Court require senior officials of the CIA and the FBI to testify regarding their understanding of the agreements.

On March 18, federal defendants filed a second letter, dated March 18, further clarifying one point in the March 12 letter, and indicating that a basic purpose of that letter was to establish that their interpretation of certain language in the FBI agreement is the same as their interpretation of parallel language in the proposed legislative FBI Charter, as expressed in testimony and commentary.

On March 23, 1981 and thereafter, further statements were filed by several objecting class members. The last set of objections, these to certain proposed supplementary proposed findings of fact and conclusions of law requested by the Court, was filed June 11, 1981.

### CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter of these cases, and of all parties. 28 U.S.C. §§ 1331 and 1343; 18 U.S.C. § 2520; 5 U.S.C. § 552a.

■ Rule 23(e) of the Federal Rules of Civil Procedure provides:

"(e) Dismissal or Compromise. A class action 'shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

Rule 23(e) notice must sufficiently convey the required information and afford reasonable time for interested persons to make their appearance with due regard for the practicalities and peculiarities of the case. *Air Lines Stewards, et al. v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972).

Having reviewed the affidavits of plaintiffs' counsel regarding the manner and extent of notice, and taking into account the further information presented at the fairness hearing, the Court finds that notice was provided in a fair and adequate manner, consistent with the Court's order of December 30, 1980 directing notice, with Rule 23(e), and with due process.

■ Notice was also timely. The three class members raising the issue of timeliness were notified, respectively, at least 31, 29, and more than 30 days before the fairness hearing. In contrast, notice in *Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir. 1980), the leading case in this Circuit on settlements of civil rights class actions, was mailed 12 days before the fairness hearing. 616 F.2d at 310; 471 F.Supp. at 805. See also *Air Lines Stewards, supra*, 455 F.2d at 108 (three weeks' notice timely).

■■ There is an "overriding public interest in favor of settlement," especially in class actions. *Armstrong, supra*, 616 F.2d at 312–13. By definition, a fair settlement need not satisfy every concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits. "[T]he essence of settlement is compromise . . . a solution somewhere between the two extremes." *Id.* at 315.

■ The Court has a limited role in reviewing the settlement.

Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *Id.*

■ Moreover, the Court cannot "modify the terms of a settlement proposal; it can only accept or reject the proposal as presented to it." *Armstrong, supra*, 471 F.Supp. at 804. This principle is especially important where, as here, virtually every line and paragraph of the settlement document, and in many instances individual words, are the end products of intense, adversary, and prolonged negotiations.

■ Nonetheless, because a class action settlement affects the rights of absent class members, and often, as here, the larger public interest, the Court may not uncritically accept it. *Armstrong*, 616 F.2d at 313. The settlement may be approved only if the

Court finds it to be "fair, reasonable and adequate." *Id.* The burden of persuasion on the issue of fairness is on the proponents of the settlement. The Court must "clearly set forth in the record its reasons for approving the settlement," stating its reasoning "with particular clarity." *Armstrong*, 616 F.2d at 315, 319.

Although the decision whether to approve the settlement is within the discretion of the District Court, and the decision is necessarily made on a case-by-case basis, certain factors have been consistently identified as relevant to the fairness determination. Among them are:

(1) The strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.

(2) The defendant's ability to pay.

(3) The complexity, length and expense of further litigation.

(4) The amount of opposition to the settlement.

(5) Presence of collusion in reaching a settlement.

(6) The reaction of members of the class to the settlement.

(7) The opinion of competent counsel.

(8) The stage of the proceedings and the amount of discovery completed.

(9) Whether the settlement initiates or authorizes an illegal conduct. *Id.*

Each of these factors will be discussed.

### Factor 1: Strength of Plaintiffs' Case vs. Amount Offered in Settlement

This factor is generally regarded as the most important. While it requires some consideration of the merits, the court must refrain from reaching conclusions on issues which have not been fully litigated.

The gravamen of plaintiffs' complaints against the CIA, FBI and the other settling defendants is a constitutional challenge to an alleged class-wide course and pattern of conduct consisting of three basic types of alleged CIA and FBI domestic intelligence practices: (a) investigations of persons and groups based on their lawful exercise of First Amendment rights, (b) disruption and harassment of persons and groups engaged in the lawful exercise of First Amendment rights, and (c) the use against such persons and groups of investigative means which are overly intrusive, in violation of First and Fourth Amendment rights, or which are otherwise illegal.

The relief sought on behalf of the plaintiff classes is essentially twofold: a declaration that such investigations, disruption, and investigative means are unconstitutional, and an injunction prohibiting their continuation. The FBI settlement agreement's general principles provide the plaintiffs with an enforceable equivalent of the injunctive relief they sought in this litigation.

With respect to investigations based on lawful First Amendment activities, ¶ 3.4(a) of the FBI settlement agreement declares:

"The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States."

With respect to disruption and harassment of the lawful exercise of First Amendment rights, ¶ 3.4(b) of the FBI settlement agreement declares:

"The FBI, in investigating United States persons, shall not employ any technique designed to impair their lawful and constitutionally protected political conduct or to defame the character or reputation of a United States person."

With respect to investigative means, and the scope and intrusiveness of investigations, ¶ 3.4(c) declares:

"The FBI shall conduct its investigations with minimal intrusion consistent with the need to collect information or evidence in a timely and effective manner, and shall conduct investigations in a man-

ner reasonably designed to minimize unnecessary collection and recording of information about the lawful exercise of First Amendment rights."

These principles are made permanent and legally enforceable by the FBI settlement agreement. Under the final proviso to ¶ 3.6, future Justice Department and FBI regulations, guidelines, procedures and conduct relating to investigative techniques described in paragraph 3.5 must comply with these principles. Under ¶¶ 5.1 and 5.2, "any terms" of the settlement, including these principles, may be enforced by a petition in this Court "for an appropriate order to enforce the stipulation."

In short, the principles of ¶ 3.4, together with the enforcement provisions of ¶¶ 5.1 and 5.2 of the FBI agreement, substantially accomplish the central purposes of these class actions against the FBI and Justice Department defendants, in that they articulate legally enforceable prohibitions on FBI investigations and investigative techniques.

Although less fundamental than the principles, the following additional significant limitations are placed on FBI investigations and investigative techniques by the settlement:

(a) FBI electronic surveillance in Chicago must comply with the Constitution and applicable federal statutes. (¶ 3.5(a); 18 U.S.C. §§ 2510–20; 50 U.S.C. §§ 1801–1811.) These statutes, of course, can be amended only by legislative action consistent with the Fourth Amendment. (¶ 3.6.)

(b) FBI warrantless unconsented physical searches in domestic security cases in Chicago (¶ 3.5(b)) are prohibited. This prohibition cannot be lifted by the FBI or by the Attorney General (¶ 3.6(c)). It can be lifted only by the Congress or by Presidential Executive Order (¶ 3.6(a) and (b)), and then only to the extent such warrantless searches comply with the Fourth Amendment (final proviso to ¶ 3.6). *Cf. United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (Fourth Amendment required judicial warrant for domestic security wiretaps).

(c) All applicable federal statutes, Executive Orders, and Justice Department and FBI regulations governing physical or photographic surveillance, infiltration, and data collection, dissemination, and storage (¶ 3.5(c)) are made legally enforceable (¶¶ 5.1 and 5.2).

The central prohibitory provision of the CIA settlement agreement, Section 2.4, requires the CIA to comply in Chicago with the U.S. Constitution and with all operative federal statutes, Presidential Executive Orders and written CIA internal regulations and procedures. Among the operative federal statutes is the National Security Act of 1947, 50 U.S.C. § 403, which forbids the CIA from exercising any ". . . law enforcement powers or internal security functions."

Section 4 of the CIA agreement gives plaintiffs and all U.S. persons currently residing in Chicago the right to enforce in this Court the settlement provisions. Compare, *Halkin v. Helms*, No. 75–1773 (D.D.C. June 5, 1980), appeal docketed, No. 80–2214, D.C. Cir. Together, Sections 2.4 and 4 substantially accomplish the central purpose of the class action.

■ Not only do the legal protections conferred upon the plaintiff classes by the proposed settlement agreements correspond well with the relief sought in the complaints, they also compare well with the legal relief plaintiffs would likely have obtained if the cases had gone to trial. Counsel for the plaintiffs candidly stated that by the settlement agreements they did not obtain all that they desired to obtain. At the same time, counsel for the plaintiffs and counsel for the federal defendants all recognized that the plaintiffs' cases contained certain potential legal weaknesses. Those potential legal infirmities have been considered by the Court in determining the reasonableness, fairness and adequacy of any proposed settlement agreement. After evaluating the strengths and weaknesses of the plaintiffs' case, and what the plaintiffs did receive and did not receive in the settlement agreements, the Court concludes that what was obtained in the settlement agreements fairly reflects the strengths and po-

tential weaknesses of the plaintiffs' case on the merits.

No case has been cited to the Court, and the Court is aware of none, affording declaratory or injunctive relief against the CIA or FBI which provides the plaintiffs more relief than the proposed settlements here in any single particular, much less with respect to comprehensive relief for broad classes of persons. Indeed, the Court is aware of no judicial declaration or injunction ever entered against CIA or FBI domestic intelligence activities, even on behalf of a single litigant, much less in a class action. While in this Circuit the subject of FBI covert action has been adjudicated in *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), that case did not reach the question of injunctive relief.

The law with respect to government spying which these cases concern is largely unsettled. *See generally United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Indeed, both the objectors and the plaintiff proponents of the proposed FBI settlement have represented to the Court that the FBI and the Justice Department, in pending litigation elsewhere, currently assert that the Constitution does not prohibit them from engaging in practices which would be prohibited in Chicago by the principles of the settlement here.

Absent the proposed settlements, plaintiffs' proof of their case at trial would have encountered a number of risks, some of which, in other litigation involving similar issues, have seriously hampered or proved fatal to proof of the plaintiffs' case. These include the risk that important evidence would have been unavailable because of evidentiary privileges, especially the "state secrets" and informer's privilege, which the FBI and Justice Department defendants have extensively asserted in this litigation. See *Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1978) (state secrets); *In re Attorney General*, 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979) (informer's privilege).

Also, there was the risk that the claims for declaratory and injunctive relief would have been denied as moot. See *Halkin v. Helms*, No. 75–1773 (D.D.C. June 5, 1980), appeal pending, No. 80–2214 (D.C. Cir.). While the parties vigorously dispute the extent to which the FBI practices alleged in the complaints are continuing or are likely to resume if not enjoined, and the court, of course, cannot rule on this question without its being fully litigated, the FBI and Justice Department defendants have made plain their intention to assert this defense, and there is at least some evidence to support it. See proposed FBI settlement, ¶¶ 2.1(1), (2) and (3). With respect to the claims against the CIA, it is noteworthy that despite extensive pretrial discovery, plaintiffs have not uncovered any evidence of CIA internal security or law enforcement activities in Chicago since 1973, several years prior to the filing of their claims against CIA defendants.

Finally, there was the risk that even if the plaintiffs prevailed on the merits, and their claims for injunctive relief were held not moot, the court might nonetheless decline to issue an injunction, or might issue an injunction less protective of their rights than the provisions of the proposed settlements. The FBI and Justice Department defendants have made plain their intention to contend at trial that "the FBI simply should not be run by traditional injunction," for both "public policy and legal reasons." (Transcript of opening statements by counsel, February 13, 1981, at 30.)

In sum, with respect to the first factor, the amount offered in settlement is fair, reasonable and adequate when balanced against the strength of plaintiffs' case on the merits.

### Factor 2: Defendants' Ability to Pay

Since the claims of plaintiffs classes are only for declaratory and injunctive relief, this factor is not relevant here. *Cf. Armstrong, supra*, 471 F.Supp. at 805.

### Factor 3: Complexity, Length and Expense of Further Litigation

The Court has already found that it is very likely that further litigation, absent

the proposed settlements, would be extremely complex, lengthy and expensive. The reasons for this conclusion—the factual breadth of these cases, the number and difficulty of legal issues they pose, and the sharply adversary relation of the parties and history of the litigation—need no further elaboration.

### Factor 4: Amount of Opposition to the Settlement

█ The court may approve a fair settlement over objections by some or many class members, and even despite criticism by some named plaintiffs. *Armstrong*, 471 F.Supp. at 804; 616 F.2d at 326.

The number of objectors here is not undue, given the many thousands of plaintiff class members who received notice, the unsettled nature of some of the relevant law, and the depth of antagonism between many of the plaintiff class members and the CIA, the FBI and Justice Department defendants. Indeed, the amount of opposition by class members here is comparable to that in *Armstrong*, where 45 persons testified at the fairness hearing and numerous others sent in written statements, "most to express their dissatisfaction with the settlement," which was nonetheless approved as fair. 616 F.2d at 326; 471 F.Supp. at 805.

Moreover, most of the objections here, as in *Armstrong*, although "thoughtful and informative," are also "somewhat misinformed," both in their understanding of the proposed settlements and as to the state of the relevant law. 616 F.2d at 326, quoting 417 F.Supp. at 812. Based upon the written comments received by the Court and upon hearing the testimony of the attorneys and individuals who spoke at the hearing, it was readily apparent to the Court that many of those individuals who spoke were not familiar with the details of the settlement agreements. Many of their comments were

based solely upon the Notice rather than upon the provisions of the detailed agreements. While the comments of some speakers were helpful to the Court, the comments of many of those speakers have been evaluated with the understanding that the speakers had never examined the full terms of the proposed agreement. Also, while certain of the objectors were clearly well informed and forceful in their objections, they were persons, or counsel for persons, who were litigating against some of the defendants in other cases.

### Factor 5: Presence óf Collusion in Reaching a Settlement

No suggestion of collusion has been made, nor, on this record, would any such suggestion be credible.

### Factor 6: Reaction of Members of the Class to the Settlement

█ The law in this Circuit as implied in *Armstrong* is that the Court must consider all objections, but need not state individualized findings with respect to each of them. 616 F.2d at 326, 471 F.Supp. at 812–13. However, the Court's reasoning must be stated "with particularly clarity." 616 F.2d at 319. In light of this last admonition, the case law elsewhere requiring a reasoned response on the record to all objections of substance and some explicit statement concerning all objections, *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 836 (9th Cir. 1976), the Court will discuss all objections of substance.[4]

### Vagueness

█ It is objected that the principles of the proposed settlements are so vague as to render them a sham. The Court does not agree. The ambiguities in the potential applications of these principles arise from the fact that they are, for good reasons,

---

4. The spectrum of objections raised by objecting class members ranged from frivolous to serious. The Court has considered all the various objections. The more serious objections collectively constitute a "wish list" of concerns, many of which counsel for plaintiffs advised they shared and would have adopted if they could unilaterally dictate the terms of settlement, but which the settling defendants adamantly oppose, and which plaintiffs would be far from certain of winning at trial. However, some of the points raised by objectors are not even within the scope of the lawsuit or in any conceivable way related to the issues.

worded in general terms. Plaintiffs' central claims are constitutional in nature. Like any principles grounded in constitutional values, it is appropriate that the remedial principles of the settlement be generally framed. They are meant to govern a great variety of specific situations, many of which cannot now be foreseen, over an extended period of time. Moreover, the proposed settlements resolve class actions the comprehensive scope of which embrace a great variety of CIA and FBI practices. Generally worded principles are, if not indispensable, at least invaluable to the settlement of such lawsuits. The alternative—attempting to agree in advance on a wide variety of specific questions in hypothetical settings—is neither practical nor necessarily wise.

The parties have candidly admitted that they would not necessarily agree on all possible applications of the language of the principles in the abstract or in hypothetical cases. However, both sides have agreed to submit to enforcement of the principles by the Court, if and when specific disagreements arise in concrete cases in the future. Having examined the language of the principles, as well as the various questions raised and views expressed concerning the possible interpretations, the Court is confident that in the context of concrete cases, it will be able to perform the normal judicial function of reasonably interpreting the language to accomplish the purpose of the document as a whole. In this task, the Court will be aided by the considerable "legislative history" of the settlement agreements. As the Court made clear at the March 13 hearing, the parties' various interpretations of the principles expressed to date are not binding (Transcript at 3–4, 14, 20). All that is binding now is the language of the document; the only binding interpretations will be made later—by the Court—in the context of real disputes.

### Alleged Continuing Abuses

■ Allegations have been made that the CIA and FBI continue to engage in some of the practices alleged in the complaints. The Court, of course, expresses no opinion on the substance of these allegations. However, if true, such facts would argue for approving the settlements, not disapproving them. If such alleged practices continue after the settlements are approved, plaintiffs and the plaintiff class can bring their evidence before the Court and, if warranted, obtain full discovery, and thereafter a ruling by the Court on whether the activities in question are lawful, and if they are not, an appropriate remedial order.

### Enforcement

■ The enforcement procedures are said to be too burdensome. Objectors argue that enforcement should be triggered by a "sworn claim of reasonable belief that a violation is taking place, together with a description of the activity complained of." (Notice of Dismissal under protest, filed December 24, 1980, at 2.) In fact, under each of the agreements enforcement is triggered by a threshold finding of "reasonable grounds" to believe that a violation has occurred or is occurring, based on facts alleged in a petition supported by affidavit or declaration. The purpose of the "reasonable grounds" requirement is to prevent frivolous or harassing enforcement petitions; both the purpose and the language chosen to accomplish it are reasonable.

A related objection to both settlement agreements is that they condition enforcement orders on a finding of "a pattern of substantial noncompliance or a serious intentional noncompliance." This language, too, reflects a reasonable compromise which permits civil enforcement of the settlements without subjecting the CIA or FBI to court orders based on minor or technical violations.

### Changes in Government Regulations

Some objectors argue erroneously that the proposed FBI settlement rests on government assurances or on Attorney General Guidelines which can be unilaterally withdrawn. It does not. The FBI agreement rests on permanent principles (¶ 3.4) which govern Justice Department and FBI procedures and conduct in Chicago, and which are subject to independent, external

construction and enforcement by this Court. (¶¶ 5.1 and 5.2.)

*Findings and Admissions*

Some objectors argue that both settlement agreements are fatally defective because they lack more extensive admissions or finding of wrongdoing by the Court. As the Court stated at the March 13 hearing:

"Well, certainly the whole purpose of the settlement is to avoid adjudication with respect to the activity which is the basis of the complaint. I think the parties would be stunned if in submitting a class action settlement to the Court, the Court started to decide the issues. That's why people enter into settlements and I am not going to interfere in the settlement process." (Transcript at 22.)

*Foreign Counterintelligence Investigations*

■ Some objectors argue that the FBI can evade the FBI settlement agreement by simply relabeling a "domestic security" investigation as a "foreign counterintelligence" investigation. They are wrong. The settlement does not turn on labels. Whether an investigation is truly a "foreign" intelligence or counterintelligence investigation, or instead a domestic security investigation, does not necessarily depend on what the FBI chooses to call it, but on the facts underlying the investigation. *See, e. g., Zweibon v. Mitchell*, 516 F.2d 594 (D.C.Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (purported "foreign intelligence" wiretap).[5]

Moreover, even "foreign" intelligence and counterintelligence investigations of "United States persons" (¶ 6.3) in Chicago are covered by various provisions of the FBI agreement, including three of its four basic principles (¶ 3.4(b) and (c)). Neither "international terrorism," as defined in the FBI agreement (¶ 6.5), nor "activities in prepa-

ration therefor," nor knowingly aiding and abetting such terrorism, includes the "lawful exercise of First Amendment rights" (¶ 2.2(5)). To the extent the provisions of the proposed FBI settlement are more relaxed with respect to "foreign" intelligence or counterintelligence than "domestic" security investigations, this distinction is not without foundation in the current state of the law. *E. g., United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (requiring judicial warrants for domestic security wiretaps, but leaving open the question of whether warrants are required for taps on agents of foreign powers).

*"United States Persons"*

■ The principles of each of the settlement agreements protect "United States persons," defined to include United States citizens, aliens lawfully admitted for permanent residence, unincorporated associations organized in the United States or substantially composed of United States citizens or aliens lawfully admitted for permanent residence, and corporations incorporated in the United States. Objectors express concern that aliens not lawfully or permanently admitted to residence in this country, including "undocumented workers," are left without protection.

As a practical matter, such persons are indeed covered by the principles of the settlements when their activities are through groups organized in this country, since "United States persons" include all unincorporated associations "organized" in this country and all corporations incorporated here. For example, in the past most FBI domestic intelligence investigations of individuals in Chicago have been based on their affiliations with groups (92% according to the G.A.O. sample). To the extent individual aliens not lawfully or permanently ad-

---

5. In a variety of contexts, federal courts have been alert to pierce questionable claims of "national security." *E. g., ACLU v. Brown*, 609 F.2d 277 (7th Cir. 1979) (Cummings, J., dissenting), panel majority reversed in pertinent part on rehearing en banc, 619 F.2d 1170, (7th Cir. 1980) (purported "state secrets"); *Ray v. Turn-*

er, 587 F.2d 1187 (D.C.Cir.1978) (*de novo* judicial review of Executive Branch security classifications under Freedom of Information Act); *United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir.1975), *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977) (purported "national security" burglary).

mitted to residence, and not acting through groups, are not covered by the principles, this distinction reflects the greater uncertainty in the law with respect to the legal rights of such persons. *See generally Narenji v. Civiletti*, 617 F.2d 745 (D.C.Cir.1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), and cases cited therein.[6] In any event, the proposed settlements do not sanction CIA or FBI investigation of such persons. The agreements simply do not address such persons specifically, and leave them free in the future to press any constitutional arguments against FBI or CIA surveillance of them, either under the agreements or in a separate lawsuit.

### Disruption

Objectors argue that the FBI settlement (¶ 3.5(b)) prohibits only "unlawful" FBI disruption activities, and should prohibit *all* disruption of lawful political activity. Two separate provisions of the settlement prohibit such disruption. One is a basic principle prohibiting techniques "designed to impair" lawful political activity, or to defame the character or reputation of a United States person (¶ 3.4(b)). The other provision, which prohibits "any unlawful disruption or harassment of the lawful activities of any United States person" (¶ 3.5(b)) is *in addition* to the basic principle of ¶ 3.4(b). It leaves for the Court to determine what disruption beyond that covered by ¶ 3.4(b), if any, is unlawful," in the context of a future enforcement case.

### Miscellaneous Objections

It is objected that controls on investigative techniques, unlike the principles, are not made permanent. However, those techniques subject to Fourth Amendment warrant requirements, in the present state of the law, are tightly restricted.

It is objected that plaintiff representatives who examine future government reports on questionable intelligence activities should not be bound to secrecy on pain of contempt of court. However, such plaintiff representatives can report the contents of such reports to the Court for enforcement purposes. (¶ 15.3).

It is objected that there should be no constraints on retention or publication of documents produced in discovery, other than that victims of wrongdoing should have their names withheld unless they specifically consent to disclosure. However, the effect of the proposed settlement (¶ 7.3) is that there are no other constraints.

It is objected that informers' identities should be revealed. However, it is doubtful whether their names would be revealed in any case. *See In re Attorney General*, 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979).

It is objected that the settlement does not address abuses of the federal Grand Jury system. Neither do the lawsuits. Grand Jury proceedings are under the control of the federal court and the United States Attorney, neither of whom are defendants in this case.

---

**6.** The distinction in the national security intelligence field between "U.S. persons" and others was created by both Presidential and Congressional directives. Executive Order 12036, § 4–214 (governing national security intelligence activities) (from which the settlement's definition of "U.S. person" is taken verbatim); 50 U.S.C. § 1801(i) (the less inclusive definition of "U.S. person" in the Foreign Intelligence Surveillance Act). Plaintiffs would therefore encounter legal difficulties in challenging the distinction. *See Mathews v. Diaz*, 426 U.S. 67, 78–85, 96 S.Ct. 1883, 1890–1894, 48 L.Ed.2d 478 (1976).

Non-U.S. persons, not acting through groups which are themselves "U.S. persons," are nonetheless protected by several provisions of the settlement. Electronic surveillance of them must be "in accordance with the Constitution and applicable federal statutes, 18 U.S.C. §§ 2510–20 (1976) and 50 U.S.C. §§ 1801–1811 (Supp. II 1978." (¶ 3.5(a), p. 20.) They are included within the ban on "warrantless unconsented physical searches in domestic security investigations" (¶ 3.5(b), p. 20); the prohibition of "any unlawful entries that constitute searches under the Fourth Amendment" (id.); the requirement that FBI infiltration of organizations in domestic security investigations comply with applicable laws, regulations and guidelines (¶ 3.5(c)(2), pp. 20–21); and the requirement of compliance with the Constitution (¶ 3.6, p. 22). All of these requirements may be enforced by any non-U.S. person who is "a member of the plaintiff classes" (¶ 5.1, p. 25).

It is objected that "minimal" intrusion is too much; and that there should be no intrusion. But all investigations involve some degree of intrusion, however slight. The only practical safeguard is to minimize such intrusion to that which is necessary.

It is objected that not enough court costs are to be paid. However, the settlements provide for payment of all costs taxable by the applicable statute.

It is objected that no damages are to be paid. However, no damage claims on behalf of the plaintiff class members were asserted against the CIA, the Justice Department and FBI defendants in these cases, and none are affected by the settlement.

It is asserted that the named plaintiffs and their counsel inadequately represent the class. This assertion is conclusory with no basis in the record.

The objection that the defendants are not being criminally prosecuted is frivolous in these civil cases.

The objection that the settlement is limited to Chicago overlooks the fact that the activities challenged were those in Chicago. See the class definitions in the Findings of Fact.

It is objected that the settlements permit some surveillance of First Amendment activity in the course of criminal investigations, and that only investigations based "solely" on First Amendment activity are prohibited. However, the Court can imagine circumstances in which some such surveillance could be justified, as when a written manifesto is released by a political organization explaining its reasons for bombing a corporate headquarters.

It is objected that the FBI agreement does not limit the FBI's ability to gather information about lawful political activity through informers or other private parties. However, the prohibition on investigations of lawful political activity (¶ 3.4(a)), does not turn on the means by which such an investigation is conducted.

It is objected that the principles of the FBI settlement apply only to FBI activities relating to "domestic" activities, i. e., activities within the borders of the United States and does not regulate the FBI's behavior with respect to a person's activities outside the country. However, these lawsuits do not concern FBI surveillance of persons in other countries and the fact that the settlement goes no further than it does is justified.

The Socialist Workers Party objection that the settlements incorrectly characterize that Party as advocating the necessity of violent revolution, misreads the agreements, neither of which characterizes either the Party or its advocacy.

The Socialist Workers Party objects that warrantless unconsented physical searches in domestic security cases are permitted by the FBI agreement "in circumstances in which a warrant is not required to conduct a search for law enforcement purposes" (¶ 3.5(b)). This exception merely recognizes established Fourth Amendment law permitting warrantless searches in certain situations, e. g., when FBI agents are in hot pursuit of a fleeing felon.

The Socialist Workers Party objection that ¶ 3.5 of the FBI agreement authorizes warrantless searches to place wiretaps, misreads the settlement. This paragraph merely states that it "does not apply" to searches related to electronic surveillance, because the subject matter of electronic surveillance is covered instead by ¶ 3.5(a).

The objection that the settlement permits the FBI to disrupt the lawful political activities of a group, once that group is under investigation, is incorrect. See ¶ 3.4(b) and ¶ 3.5(b) of the agreement.

The objection that the class notice did not explain the status of non-U.S. persons overlooks the fact that the notice used the term "United States persons," and indicated that the notice was only a summary of the settlement document. Interested persons were fairly on notice to examine the document to determine the meaning of "United States persons" and the status of non-U.S. persons, and, in fact, several persons did object at the fairness hearing and in their

written objections to the settlement's effect on non-U.S. persons.

### Factor 7: Opinion of Competent Counsel

 The Court is "entitled to rely heavily on the opinion of competent counsel." *Armstrong*, 616 F.2d at 325.

Counsel for the participating plaintiffs and for the federal defendants all spoke in favor of the proposed settlement agreement. They all stated that the suits were difficult and complex, that the negotiating process had been difficult and at arm's length, and that the proposed settlement agreement provided a fair, reasonable and adequate disposition of the suits. All of those counsel stated that these agreements, like any settlement, involved concessions on both sides which made final agreement possible. The Court has found that counsel for the parties participating in the settlement are highly competent and relies in part on their strong endorsement of the proposed settlements.

### Factor 8: Stage of Proceedings and Amount of Discovery Completed

The proposed settlements were entered into when massive discovery was substantially complete,[7] plaintiffs' draft final pretrial materials had been served, and both sides were fairly apprised of the facts likely to be adduced at trial, and fairly enabled to assess the likely outcome of trial.

### Factor 9: Whether the Settlement Initiates or Authorizes Any Illegal Conduct

 A fair settlement may not initiate or authorize any illegal conduct. However, the Court must not decide unsettled legal questions. Any illegality or unconstitutionality must appear "as a legal certainty on the face of the agreement." Further, the conduct must be illegal "as a general rule," according to the state of the law at the time the settlement is presented to the District Court for approval. *Armstrong*, 616 F.2d at 319–322. No illegal or unconstitutional conduct is authorized by the proposed settlements.

Considering all of the foregoing factors, and being fully advised in the premises, the Court concludes that the FBI settlement agreement and the CIA settlement agreement are fair, reasonable and adequate, and accordingly that each should be, and hereby is, approved by the Court.

The settlement agreements resolve all claims asserted in these actions by all *ACLU* named plaintiffs, the participating *Alliance* named plaintiffs, and the plaintiff classes, against the settling defendants. It does not resolve all claims of all parties against all defendants in these cases. Pursuant to Rule 54(b), Federal Rules of Civil Procedure, the Court hereby expressly finds that there is no just reason for delay and hereby directs the entry of final judgment upon all claims resolved by the proposed settlement agreements.

IT IS ACCORDINGLY ORDERED AND FINALLY ADJUDGED THAT:

 1. The settlements embodied in the Joint Motions and Stipulations (and Attachments thereto) heretofore filed by the proponents of the settlements are hereby approved and incorporated herein.

2. Pursuant to the Joint Motions and Stipulations and the Court's approval of them, the claims asserted against the settling defendants in these cases by all *ACLU* named plaintiffs, the participating *Alliance* named plaintiffs, and the plaintiff classes as established by earlier orders in these cases, are hereby dismissed with prejudice.

3. Pursuant to the Joint Motions and Stipulations the settling defendants shall pay the taxable costs incurred in these cases by the *ACLU* named plaintiffs and the *Alliance* named plaintiffs.

4. The Court shall enforce the FBI settlement agreement in accordance with Part V of the Joint Motion and Stipulation relating to that agreement.

5. The Court shall enforce the CIA settlement agreement in accordance with Part

---

7. While full discovery of all files of organizations such as the Black Panther Party, the Young Lords, and CORE was restricted, the discovery conducted by the plaintiffs was adequate.

IV of the Joint Motion and Stipulation relating to that agreement.

## EXHIBIT A

### PERTINENT PROVISIONS OF THE FBI SETTLEMENT AGREEMENT

"3.4 The parties agree that the following general principles apply to FBI activities relating to the domestic activities of United States persons:

(a) The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States.

(b) The FBI, in investigating United States persons, shall not employ any technique designed to impair their lawful and constitutionally protected political conduct or to defame the character or reputation of a United States person.

(c) The FBI shall conduct its investigations with minimal intrusion consistent with the need to collect information or evidence in a timely and effective manner, and shall conduct investigations in a manner reasonably designed to minimize unnecessary collection and recording of information about the lawful exercise of First Amendment rights.

"3.5 In return for the release of all claims, as more fully set forth in Paragraph 3.8, below, the Attorney General and the Director of the FBI, on behalf of themselves, their successors, and their subordinates, agree that:

(a) Any electronic surveillance activities in the City of Chicago shall be in accordance with the Constitution and applicable federal statutes, including 18 U.S.C. §§ 2510–20 (1976) and 50 U.S.C. §§ 1801–1811 (Supp. II 1978).

(b) They shall not conduct in the City of Chicago any warrantless unconsented physical searches in domestic security investigations, any unlawful unconsented physical searches of premises or property of U.S. persons in foreign intelligence collection or foreign counterintelligence investigations, any unlawful entries that constitute searches under the Fourth Amendment, or any unlawful disruption or harassment of the lawful activities of any United States person. Nothing in this subsection shall prohibit a warrantless search in circumstances in which a warrant is not required to conduct a search for law enforcement purposes. As used in this subsection the term "unconsented physical searches" does not apply to a search for the purpose of placing, maintaining, or removing authorized electronic surveillance devices or conducting surveys in connection therewith; or to the receipt by the FBI of information, property or materials furnished by individuals acting on their own initiative, without direction or request by the FBI, regardless of the manner of acquisition.

(c) Any of the following investigative activities in domestic security investigations or in foreign intelligence collection or foreign counterintelligence investigations concerning U.S. persons shall comply with all applicable federal statutes, Presidential Executive Orders, written Departmental or Bureau regulations, guidelines and other procedures established in accordance with such statutes or Executive Orders, including but not limited to the procedures and instructions listed in ¶ 2.1 above. The statutes, Executive Orders, regulations, guidelines and procedures referred to in the preceding sentence are those in effect on the effective date of this Joint Stipulation.

(1) Physical or photographic surveillance of any U.S. person in the City of Chicago not employed by the Department of Justice.

(2) Participation in any organization in the City of Chicago by FBI personnel or informants or assets without disclosing their intelligence affiliation to appropriate officials in the organization; and

(3) The acquisition, dissemination and storage of information about U.S. persons in the City of Chicago not employed by the Department of Justice."

### EXHIBIT B

### PERTINENT PROVISIONS OF THE CIA SETTLEMENT AGREEMENT

"2.4 In return for the release of all claims, as is more fully set forth in Paragraph 2.6 below the Director of the CIA, on behalf of himself, his successors, and their subordinates, agrees that all of the CIA's activities involving United States persons in the City of Chicago shall comply with the United States Constitution and with all operative applicable federal statutes, Presidential Executive Orders, and written CIA regulations, guidelines, and procedures.

"2.5 Upon written request to the CIA General Counsel, a former named plaintiff or a United States person residing in the City of Chicago will be provided free a citation to, or alternatively, a copy of the unclassified portions of the then existing written regulations, guidelines and procedures referred to in subparagraph 2.4 above, at the rate of reimbursement then applying under the Freedom of Information Act."