ALLIANCE TO END REPRESSION,
et al., Plaintiffs,

v.

CITY OF CHICAGO, et al., Defendants.

AMERICAN CIVIL LIBERTIES
UNION, et al., Plaintiffs,

v.

CITY OF CHICAGO, et al., Defendants.

Nos. 74 C 3268, 75 C 3295.

United States District Court,
N.D. Illinois, E.D.

April 18, 1983.

Richard Gutman, Chicago, Ill., for Alliance plaintiffs.

Douglass W. Cassel, Jr., Business and Professional People for the Public Interest, Chicago, Ill., for ACLU plaintiffs.

J. Charles Kruse, Sp. Litigation Counsel, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

These actions come before the court on motions for preliminary relief. Plaintiffs seek an order temporarily restraining the Federal Bureau of Investigation from implementing within the City of Chicago portions of the Attorney General's newly-announced Guidelines on Domestic Security/Terrorism Investigations. (Hereafter referred to as the "Reagan Guidelines"[1]) Plaintiffs contend that the challenged portions of the new Guidelines are inconsistent with the "permanent principles," *Alliance to End Repression v. City of Chicago,* 91 F.R.D. 182, 200 (N.D.Ill.1981), underlying

the settlement agreement concluding these two lawsuits. For the reasons to follow, the court finds that the plaintiffs are entitled in part to relief they seek.

### I.

These cases commenced nearly ten years ago with the filing of complaints asserting that various "federal defendants"[2] had engaged in conduct within the City of Chicago violative of the plaintiffs' constitutional rights. In particular:

> Plaintiffs in both cases claim that the settling defendants have conducted surveillance of, and compiled dossiers on, their lawful political and other lawful activities; gathered information about plaintiffs by unlawful means, including warrantless wiretaps and break-ins, unlawful use of infiltrators and informers, and by other unlawful means; disrupted and harassed plaintiffs' lawful activities; and further, that defendants have also committed these alleged wrongs against members of the plaintiff classes, all as part of a continuing course and pattern of alleged illegal conduct.

*Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 186. After many years of "sharply contested" litigation, *id.* at 187, the parties proposed in late 1980 a settlement agreement for the court's approval.

As both suits had been certified as class actions, *Alliance to End Repression v. Rochford,* 565 F.2d 975 (7th Cir.1977) (affirming the certification order), a fairness hearing on the terms of the proposed settlement was held. *See* Fed.R.Civ.P. 23(e). The court heard arguments from numerous objectors, but ultimately entered the agreement on August 11, 1981, finding it "fair, reasonable and adequate." *Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 204.

1. This document, promulgated March 7, 1983, also contains Guidelines relating to "General Crimes Investigations" and "Racketeering Enterprise Investigations." These standards are not relevant here, except for the portion of the "General Crimes" section dealing with "Prelim-

inary Inquiries." *See* Part IV., *infra.* The full text of the new Guidelines can be found at 32 Crim.L.Rep. (BNA) 3087 (1983).

2. The "federal defendants" are specifically listed at 91 F.R.D. 186.

In broad brush, the agreement sets forth in ¶ 3.4 several "general principles" the FBI must follow while conducting "domestic security investigations." Paragraph 3.5 of the agreement further restricts in more specific ways the Bureau's latitude of operation. In particular, ¶ 3.5(c) incorporates, *inter alia,* the rules set forth in the then-governing Guidelines on domestic security investigations promulgated by former Attorney General Edward H. Levi. The Reagan Guidelines supersede the Levi document.

■ The prospect of superseding Guidelines was considered and dealt with by the parties in drafting their agreement. Paragraph 3.6(c) holds that superseding regulations must in general be employed in construing ¶ 3.5(c). However, the final proviso to ¶ 3.6 makes explicit that "future or amended written Departmental or Bureau regulations, guidelines or other procedures, or conduct relating to the use of investigative techniques described in Paragraph 3.5 shall be in accordance with the principles stated in Paragraph 3.4, and the applicable provisions of federal statutes and the United States Constitution." Because of this caveat, the court dismissed the objection voiced at the settlement hearing "that the proposed FBI settlement rests on government assurances or on Attorney General Guidelines which can be unilaterally withdrawn. It does not. The FBI agreement rests on permanent principles (¶ 3.4) which govern Justice Department and FBI procedures and conduct in Chicago, and which are subject to independent, external construction and enforcement by this Court.

(¶¶ 5.1 and 5.2) [authorizing, *inter alia,* petitions by any plaintiff "for an appropriate order to enforce the Stipulation."]" *Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 200–01. At oral argument on the present motions, the Government acknowledged that it is within the court's power to enjoin the implementation within Chicago of the new Guidelines to the extent they embody standards for action inconsistent with those established by the settlement agreement.[3] The court will now address whether this is in fact the case.[4]

## II.

■ Paragraph 3.4(a) of the agreement explicitly bars the FBI from "conduct[ing] an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States." The Reagan Guidelines encourage violations of this norm by permitting investigations to commence solely on the basis of a target's exercise of protected First Amendment rights.

The reasoning leading to this conclusion begins with section III.B.1.a. of the new Guidelines which provides:

A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States. The standard

**3.** There can be no doubt that the plaintiffs have standing to mount the sort of facial challenge outlined in the text. Paragraph 3.6 of the agreement flatly prohibits the promulgation of new Guidelines (to the extent they pertain to Chicago) if the principles they contain conflict with those found in ¶ 3.4. In the language of the agreement, such Guidelines "*shall* be in accordance with the principles stated in Paragraph 3.4." (emphasis added) As the court previously remarked, "[u]nder the final proviso to ¶ 3.6, future Justice Department and FBI regulations, guidelines, procedures and conduct relating to investigative techniques described in

paragraph 3.5 *must* comply with these principles." *Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 197 (emphasis added). Thus, plaintiffs have suffered injury-in-fact by the very promulgation of the new Guidelines, assuming of course that the allegations of facial inconsistency are in fact correct. Under such circumstances, defendants have breached an obligation owed directly to the plaintiffs under the terms of the agreement.

**4.** The full text of paragraphs 3.4, 3.5, and 3.6 of the settlement agreement are reproduced in the Appendix following this opinion.

of "reasonable indication" is identical to that governing the initiation of a general crimes investigation under Part II. In determining whether an investigation should be conducted, the FBI shall consider all of the circumstances including: (1) the magnitude of the threatened harm; (2) the likelihood it will occur; (3) the immediacy of the threat; and (4) the danger to privacy and free expression posed by an investigation.

The cross-referenced standard of "reasonable indication" (section II.C.(1))

is substantially lower than probable cause. In determining whether there is a reasonable indication of a federal criminal violation, a Special Agent may take into account any facts or circumstances that a prudent investigator would consider. However, the standard does require specific facts or circumstances indicating a past, current, or impending violation. There must be an objective, factual basis for initiating the investigation; a mere hunch is insufficient.

Section I of the Guidelines—entitled "General Principles"—offers further guidance as to when the requisite "objective, factual basis" for investigation is present:

In its efforts to anticipate or prevent crime, the FBI must at times initiate investigations in advance of criminal conduct. It is important that such investigations not be based solely on activities protected by the First Amendment or on the lawful exercise of any other rights secured by the Constitution or laws of the United States. When, however, statements advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence, an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances or context in which the statements are made, that there is no prospect of harm.

Plainly read, the final sentence of the passage last quoted allows investigations when (1) the target "advocate[s] criminal activity"; and (2) it is not "apparent ... that there is no prospect of harm." Much of the advocacy covered by this standard, however, falls within the protective shield of the First Amendment.

*Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam), teaches that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." The standard embraced by the Reagan Guidelines is more lenient in three respects. First, under the Guidelines, the feared "harm" need not be, as it must under *Brandenburg,* "imminent." [5] Second, and also contrary to *Brandenburg,* the feared "harm" need not be "likely." [6] Finally, the speech need not be "directed" (*i.e.,* intended) [7] to cause imminent, lawless action.

To the extent, then, that the statement in paragraph 3.4 of the settlement agreement proscribing investigations "solely on the basis of activities protected by the First

---

**5.** This fact is clearly apparent from the very lack of any "imminence" requirement in the passages quoted in the text. Moreover, in an "Airtel" (a form of internal FBI memorandum) dated March 17, 1983, FBI Director William H. Webster further remarked that the new Guidelines "should eliminate any perceptions that actual or imminent commission of a violent crime is a prerequisite to investigation." (*See* Exhibit B to the Federal Defendants' Memorandum in Opposition to the *Alliance* Plaintiffs' Motion)

**6.** Indeed, under a literal reading of the statement of "General Principles," an investigation may be warranted even if there exists only "some" prospect of harm, however small. In the "Airtel" cited in note 4, *supra,* Director Webster narrowed the Guidelines' language somewhat, stating that an investigation should not commence unless "the statement of advocacy taken in context presents a *credible* threat of harm." (emphasis added) This interpretation does not eliminate the gap between the Reagan Guidelines and *Brandenburg.* Many threats may be "credible," but not "likely."

**7.** *See Hess v. Indiana,* 414 U.S. 105, 109, 94 S.Ct. 326, 329, 38 L.Ed.2d 303 (1973) (per curiam).

Amendment" means "solely on the basis of activities protected under *Brandenburg*," plaintiffs are clearly entitled to relief. The response pressed in the Government's briefs (but not in oral argument) is that this equation should not be drawn. The *Brandenburg* decision dealt with attempts by the state to punish speakers through criminal sanctions. The Reagan Guidelines, by contrast, deal only with the "more limited" power to investigate. Thus, according to the Government, an activity may be "protected" from punishment, but not from investigation.

As a matter of "pure" constitutional law, this line of argument may or may not have validity. The court expresses no opinion on this question since it is simply irrelevant. The present proceedings were not brought to vindicate First Amendment rights per se. The court is hearing an enforcement proceeding authorized by a settlement agreement, and it therefore follows that the issue is whether the promulgation and implementation within Chicago of the Reagan Guidelines violate the rights conferred by the agreement, *not* whether such activity violates the plaintiffs' rights under the Constitution. In other words, to the extent the agreement affords protection greater than that demanded by the Constitution,[8] plaintiffs may be entitled to prevail, whatever the outcome of the "pure" constitutional analysis.[9] The phrase "protected by the First Amendment" found in paragraph 3.4, though it refers by its very terms to a provision of the Constitution, cannot be construed in the abstract. It is to be given the meaning intended by the parties when they signed their agreement.

The terms of the Joint Motion and Stipulation containing the settlement agreement clearly indicate that the questioned provision in paragraph 3.4 incorporates the *Brandenburg* standard. Paragraph 3.1 of the Joint Motion states that *both* parties entered into the settlement on the basis of the "understanding of [various Governmental regulations, including in particular the Levi Guidelines] reflected in ¶ 2.2." In ¶ 2.2 the plaintiffs expressed their view, confirmed through extensive discovery, that the Levi Guidelines were "not intended to permit domestic security investigations of groups which advocate the necessity for violent revolution at some time in the indefinite future, but which do not now engage in serious crimes or violence or advocate imminent serious crime or violence." The plaintiffs believed in short that the Levi Guidelines embraced the *Brandenburg* test (a point expressly made in testimony—cited in the Joint Motion—before Congress by a Deputy Assistant Attorney General). The plaintiffs further believed that, so construed, the Levi Guidelines were "consistent with the principles of Paragraph 3.4 below." Thus, one of the understandings "reflected in ¶ 2.2" was that the phrase "protected by the First Amendment" found in ¶ 3.4 incorporated the test enunciated in *Brandenburg*. And, as noted before, *both* parties entered into the agreement on the basis of this understanding.

■ In arguing for a contrary construction, the Government relies wholly on two letters it wrote to the court during the fairness hearings on the settlement. These letters express the view that "advocacy of illegal conduct, however general or unspecific in nature, is not immune from investigation." But as the court made clear in its opinion approving the settlement, the parties' unilateral "interpretations of the principles expressed to date are not binding.

---

8. Indeed, both the objectors and the plaintiff proponents have represented to the Court that the FBI and the Justice Department, in pending litigation elsewhere, currently assert that the Constitution does not prohibit them from engaging in practices which would be prohibited in Chicago by the principles of the settlement here.

*Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 198.

9. On the other hand, even if the agreement provides less protection than the Constitution, plaintiffs might once again be entitled to relief, but not in this proceeding. Raising an argument directly under the Constitution would entail bringing a separate lawsuit, not a proceeding to enforce a settlement agreement. At oral argument, plaintiffs' counsel agreed with these sentiments.

All that is binding now is the language of the document; the only binding interpretations will be made later—by the Court—in the context or real disputes." *Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 200.

Moreover, it is significant that in drafting their agreement, the parties chose to employ a phrase—"protected by"—that is often used in First Amendment litigation to embrace the meaning ascribed by plaintiffs. The two letters cited by the Government, both written after the agreement was signed, do not justify a holding that an unusual and different meaning was intended.

■ In sum, the court finds that the settlement agreement embraces the principles of *Brandenburg* as the test for initiating investigations. The court further finds that the Reagan Guidelines authorize investigations on much lesser showings. Plaintiffs are entitled to relief, and the only question that remains on this phase of the case is the form it will take. Plaintiffs initially sought a preliminary injunction, but as defendants themselves point out in their brief, there is no reason not to make a permanent ruling now.[10] The court has found a facial inconsistency between the Guidelines and the agreement. The parties sharply disagreed over the legal meaning of the agreement, and the court has ruled. No further factual or legal issues remain to be resolved on this issue, and the value of further proceedings is accordingly difficult to detect. A permanent injunction will issue. *See* Fed.R.Civ.P. 65(a)(2).

### III.

With respect to four of the remaining challenges to the Guidelines, a different form of dispute has emerged among the parties. As to these points, there is little, if any, disagreement as to the type of conduct permissible under the agreement. The disagreement centers instead over the wording of the Guidelines. The Government asserts that the challenged language, as interpreted by the FBI, does nothing more than authorize the type of behavior all concede is allowable. The plaintiffs are not so sanguine, and fear that at some future point in time the defendants will exploit the allegedly "loose" language in the Guidelines to the hilt, and thereafter engage in conduct forbidden by the agreement.

The court will not grant plaintiffs' request for relief on this phase of the case for the simple reason that the court is not convinced that the challenged provisions mean anything more than what the FBI now represents. The defendants have made showings, both through the representations of counsel and through the documents tendered as exhibits to the defendants' brief, that the Administration does not read the disputed passages in the way plaintiffs fear. Future discovery may cast doubt on these assertions, but at present there is no basis for the court to doubt the defendants' words. As there is thus no basis upon which to conclude that the settlement agreement has been or is likely to be violated, injunctive relief is neither required nor appropriate. Courts do not lightly tread into the realm of the Executive Branch, especially when concerns of national security are implicated.

■ In reaching this conclusion, the court has carefully considered and rejected each of the arguments pressed by the plaintiffs as to why the FBI should be required to place its "narrowing constructions" explicitly in the Guidelines, and not simply in internal memos and briefs. Plaintiffs first assert that ¶ 3.6 of the settlement agreement requires that the Guidelines *themselves* comport with the principles in ¶ 3.4. Second, plaintiffs fear that the FBI's "informal" assurances might change at some future point, and without notice. They recognize that even Guidelines can be revoked (as the Levi Guidelines were), but assert

---

**10.** Clearly, *some* form of injunctive relief is needed, as there is no adequate remedy at law to rectify the harm suffered by plaintiffs. The court can conceive of no meaningful way to calculate whatever damages might be due. Moreover, the public interest in enjoining the Government to live by its agreements is patent.

that such actions by their nature attract great attention and notice. Finally, it is charged that in the First Amendment realm, the allegedly imprecise drafting found in the Guidelines simply will not do. Precision of regulation is needed. Otherwise, the exercise of rights may be chilled by the fear of what the assertedly vague language *could* mean.

The first point clearly lacks merit. The documents and briefs filed with this court have no independent significance; they are simply aids for interpreting the Guidelines. The only reason they were introduced was to establish what the Guidelines *themselves* mean.

As to the second point, it is simply too speculative to form a basis for relief. Moreover, should the Government's interpretation of the Guidelines change, the court fully expects to be informed. The court is expressly relying upon the representations made thus far as to the manner the Government will construe the disputed provisions, and has no doubt that counsel for the Government will inform the court of any change in the Government's position.[11]

■ The "chilling effect" argument is simply out of place. As pointed out before, the court is concerned at this moment with contractual rights, not with First Amendment rights per se. Thus, plaintiffs' argument is cognizable only to the extent plaintiffs are contractually entitled not to be "chilled" under any circumstances. They are not. The contract plaintiffs signed guarantees that they will not be subjected to various forms of investigation, and that the defendants will not promulgate documents inconsistent with these precepts; it does not afford blanket protection from being inadvertently "chilled" in some way. In any event, much of the "chilling effect" problem can be ameliorated by the simple expedient of having the court list the disputes that have arisen, and the Government's representations of what it believes the provisions at issue to mean. These disputes are as follows:

(1) The "General Principles" statement notes that "[n]othing in these Guidelines is intended to prohibit the FBI from collecting and maintaining publicly available information consistent with the Privacy Act." Plaintiffs fear that the FBI might maintain a dossier on controversial groups that do not qualify for a full (or even preliminary, see below) investigation. Director Webster's "Airtel" temporarily limits, pending further study, the "collection of publicly available information to cases under preliminary inquiry or full investigation in accordance with the Guidelines." In light of the court's prior comments, it should go without saying that if later study results in a new policy, the court expects to be informed.

(2) Section III.B.1.c. authorizes "the collection of information about public demonstrations by enterprises that are under active investigation pursuant to paragraph [III.]B.1.a. above." The fear here is that the FBI might not confine its surveillance to the group already under investigation, but might instead investigate other groups that appear at the demonstration as well. The FBI maintains that the former, more restrictive interpretation will be followed.

(3) Section III.B.3.a.(1) allows for the investigation of both "members of the enterprise and other persons likely to be knowingly acting in furtherance of its criminal objectives, provided that the information concerns such persons' activities on behalf or in furtherance of the enterprise." Plaintiffs theorize that the "acting in furtherance" language is so broad it could even apply to, among others, lawyers who defend revolutionaries on trial for their prior acts. The FBI represents that individuals lawfully

11. For the same reason the court declines to rule for plaintiffs on the basis of their assertion that the FBI "cannot be trusted" since the Bureau has in the past "always" interpreted its restrictions expansively once "the heat was off."

exercising their rights, such as the lawyer, are not covered.

(4) Section IV.B.3. states that "[u]ndisclosed participation in the activities of an organization by an undercover employee or cooperating private individual in a manner that may influence the exercise of rights protected by the First Amendment must be approved at FBIHQ, with notification to Department of Justice." According to plaintiffs, this provision countenances even deliberate attempts to influence a target's First Amendment activity, provided only that the necessary approval is obtained. *Compare* ¶ 3.4(b) of the agreement (banning the use of "any technique designed to impair [plaintiffs'] lawful and constitutionally protected political conduct"); ¶ 3.5 of the agreement (banning "any unlawful disruption or harassment of the lawful activities of any United States person.") Director Webster's "Airtel," however reveals that the challenged provision "does not grant authority to influence rights protected by the First Amendment. It is intended to be a safeguard to insure that our investigations do not unintentionally influence the exercise of those rights." So construed, the challenged language acts as an extra safeguard, over and above that already provided by the agreement.

### IV.

■ The final challenge concerns the use of informers and infiltrators during "preliminary inquiries." Such inquiries—which are geared solely to determining whether a full-scale investigation is warranted (section II.B.(1))—may commence if the FBI "receive[s] information or an allegation not warranting a full investigation—because there is not yet a 'reasonable indication' of criminal activities—but whose responsible handling requires some further scrutiny beyond the prompt and extremely limited checking out of initial leads." (*Id.*) Sections II.B.(4)–(6) describe the types of investigative techniques that may be used during this initial phase. The final proviso to section II.B.(6) makes clear that "highly intrusive" techniques are permissible "only in compelling circumstances and when other investigative means are not likely to be successful." The wording of Director Webster's "Airtel" indicates, however, that the development of new informants and infiltrators does not fall within the "highly intrusive" category. Accordingly, this technique may be employed if authorized by "a supervisory agent." (section II.B.(6)) Such agents "should consider whether the information could be obtained in a timely and effective way by less intrusive means." (section II.B.(4))

Plaintiffs claim that the FBI has violated the requirements of ¶ 3.4(c) of the settlement accord by not subjecting the use of informants and infiltrators to the more stringent requirements governing "highly intrusive" techniques. Paragraph 3.4(c) obligates the FBI to act "with minimal intrusion consistent with the need to collect information or evidence in a timely and effective manner, and [to] conduct investigations in a manner reasonably designed to minimize unnecessary collection and recording of information about the lawful exercise of First Amendment rights."

To hold for the plaintiffs the court must thus conclude that preliminary inquiries will be conducted in a manner violative of the principles set forth in ¶ 3.4(c) due to the FBI's failure to categorize the use of informants and infiltrators as "highly intrusive." However, there is simply no evidence to sustain such a charge, and the court is not willing to assume that the FBI will pay only lip-service to the admonitions of section II.B.(4) quoted above. As before, discovery may reveal a much different picture. But at present, plaintiffs have not shown enough to prevail.

### V.

For the reasons stated, defendants are hereby permanently enjoined from implementing within the City of Chicago the following provision found in the Attorney

General's Guidelines on General Crimes, Racketeering Enterprises and Domestic Security/Terrorism Investigations promulgated March 7, 1983:

When, however, statements advocate criminal activity . . . an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm.

In all other respects, plaintiffs' motions for temporary relief are denied. Discovery should commence promptly. Hearings on the remaining requests for a permanent injunction will begin at 11:00 a.m. on June 27, 1983.

It is so ordered.

### Appendix

3.4. The parties agree that the following general principles apply to FBI activities relating to the domestic activities of United States persons:

(a) The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States.

(b) The FBI, in investigating United States persons, shall not employ any technique designed to impair their lawful and constitutionally protected political conduct or to defame the character or reputation of a United States person.

(c) The FBI shall conduct its investigations with minimal intrusion consistent with the need to collect information or evidence in a timely and effective manner, and shall conduct investigations in a manner reasonably designed to minimize unnecessary collection and recording of information about the lawful exercise of First Amendment rights.

3.5. In return for the release of all claims, as more fully set forth in Paragraph 3.8, below, the Attorney General and the Director of the FBI, on behalf of themselves, their successors, and their subordinates, agree that:

(a) Any electronic surveillance activities in the City of Chicago shall be in accordance with the Constitution and applicable federal statutes, including 18 U.S.C. §§ 2510–20 (1976) and 50 U.S.C. §§ 1801–11 (Supp. II 1978).

(b) They shall not conduct in the City of Chicago any warrantless unconsented physical searches in domestic security investigations, any unlawful unconsented physical searches of premises or property of U.S. persons in foreign intelligence collection or foreign counterintelligence investigations, any unlawful entries that constitute searches under the Fourth Amendment, or any unlawful disruption or harassment of the lawful activities of any United States person. Nothing in this subsection shall prohibit a warrantless search in circumstances in which a warrant is not required to conduct a search for law enforcement purposes. As used in this subsection the term "unconsented physical searches" does not apply to a search for the purpose of placing, maintaining, or removing authorized electronic surveillance devices or conducting surveys in connection therewith; or to the receipt by the FBI of information, property or materials furnished by individuals acting on their own initiative, without direction or request by the FBI, regardless of the manner of acquisition.

(c) Any of the following investigative activities in domestic security investigations or in foreign intelligence collection or foreign counterintelligence investigations concerning U.S. persons shall comply with all applicable federal statutes, Presidential Executive Orders, written Departmental or Bureau regulations, guidelines and other procedures established in accordance with such statutes or Executive Orders, including but not limited to the procedures and instructions listed in ¶ 2.1 above. The statutes, Executive Orders, regulations, guide-

lines and procedures referred to in the preceding sentence are those in effect on the effective date of this Joint Stipulation.

(1) Physical or photographic surveillance of any U.S. person in the City of Chicago not employed by the Department of Justice.

(2) Participation in any organization in the City of Chicago by FBI personnel or informants or assets without disclosing their intelligence affiliation to appropriate officials in the organization; and

(3) The acquisition, dissemination and storage of information about U.S. persons in the City of Chicago not employed by the Department of Justice.

3.6. Any provision of Paragraph 3.5 shall be superseded by:

(a) Any future federal statute or Presidential Executive Order specifically authorizing or directing the Attorney General or the Director of the FBI, or their subordinates, to utilize any investigative techniques described in Paragraph 3.5, or

(b) Any future written Departmental or Bureau regulation, guideline or other procedure relating to the use of the investigative techniques described in Paragraph 3.5, which is established in accordance with and is consistent with such statute or Presidential Executive Order, or

(c) Any future or amended written Departmental or Bureau regulation, guideline or other procedure relating to the use of the investigative techniques described in Paragraph 3.5(c), which is established in accordance with and is consistent with an existing statute or Presidential Executive Order or pursuant to the Attorney General's supervisory responsibilities to manage and direct the activities of the Department of Justice,

Provided, that future or amended written Departmental or Bureau regulations, guidelines or other procedures, or conduct relating to the use of investigative techniques described in Paragraph 3.5 shall be in accordance with the principles stated in Paragraph 3.4, and the applicable provisions of federal statutes and the United States Constitution.