**ALLIANCE TO END REPRESSION, et al., Plaintiffs-Appellees,**

v.

**CITY OF CHICAGO, et al., Defendants,**

**and**

**United States Department of Justice, et al., Defendants-Appellants.**

**Nos. 83–1853, 83–1854.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 17, 1983.

Decided Feb. 23, 1984.

Vacated on Grant of Rehearing En Banc April 18, 1984.

Freddi Lipstein, Civil Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Joseph Hassett, Hogan & Hartson, Washington, D.C., Richard Martin Gutman, Richard Gutman, P.C., Chicago, Ill., for plaintiffs-appellees.

Before CUDAHY and POSNER, Circuit Judges, and DUMBAULD,* Senior District Judge.

---

* The Honorable Edward Dumbauld, U.S. Senior District Judge of the Western District of Penn-     sylvania, sitting by designation.

DUMBAULD, Senior District Judge.

On March 7, 1983, Attorney General William F. Smith announced new guidelines to govern "Domestic Security/Terrorism Investigations" by the Federal Bureau of Investigation (FBI). Separate actions were brought by appellees Alliance to End Repression (Alliance) and American Civil Liberties Union (ACLU) to enjoin enforcement of certain parts of said guidelines on the ground that they conflict with the terms of a settlement agreement (hereinafter referred to as the consent decree) approved by District Judge Susan Getzendanner on August 11, 1981, in class actions brought by appellees herein at Nos. 74 C 3268 and 75 C 3295, and reported at 91 F.R.D. 182 (N.D.Ill.E.D.1981).[1] On August 18, 1983, Judge Getzendanner granted a permanent injunction.[2]

The only provision enjoined was that stating:

When, however, statements advocate criminal activity ... an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm. [Appellants' Brief, p. 17a; 561 F.Supp. at 583.]

Paragraph 3.6 of the consent decree contemplates that the provisions of paragraph 3.5 regulating investigative activities in Chicago shall be superseded by future federal statutes or executive orders or Department or Bureau regulations or guidelines

"Provided, that future or amended written Departmental or Bureau regulations, guidelines, or other procedures, or conduct relating to the use of investigative techniques described in Paragraph 3.5 shall be in accordance with the principles stated in Paragraph 3.4, and the applicable provisions of federal statutes and the United States Constitution." [Joint Appendix (J.A.) 22]

Paragraph 3.4(a) of the consent decree prescribes as a general principle applicable to FBI activities in Chicago:

The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States. [J.A. 19]

The above paragraph embodies the distinction recognized in the challenged Smith guidelines between "preliminary inquiries" (which "shall be promptly terminated when it becomes apparent that a full investigation is not warranted") and "investigations." Investigations must be "based upon a reasonable factual predicate and shall have a valid law enforcement purpose."

The guidelines then proceed to the paragraph the last sentence of which was stricken down by the District Court's decision:

In its efforts to anticipate or prevent crime the FBI must at times initiate investigations in advance of criminal conduct. It is important that such investigations not be based solely on activities protected by the First Amendment or on the lawful exercise of any other rights secured by the Constitution or laws of the United States. When, however, statements advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence, an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances of the context in which

---

1. Paragraph 5.1 of the consent decree authorizes petitions to enforce the settlement to be brought by appellees and others. In any event the court would have inherent power to enforce a judgment.

2. Her opinion and order are reported in *Alliance to End Repression v. City of Chicago*, 561 F.Supp. 575 (N.D.Ill.E.D.1983).

the statements are made, that there is no prospect of harm. [J.A. 77]

Investigations include "general crimes investigations" (J.A. 81) and "criminal intelligence investigations" (J.A. 83), which are subdivided into "racketeering enterprise investigations" (J.A. 84) and "Domestic Security/Terrorism Investigations" (J.A. 87). This last category is the type of investigation under scrutiny in the case at bar, and to which the challenged guidelines are addressed.

The definition of criminal intelligence investigations and the policies to be practiced in their conduct are set forth clearly in the guidelines. These investigations deal with "enterprises." Such enterprises may

> see either to obtain monetary or commercial gains or profits through racketeering activities or to further political or social goals through activities that involve criminal violence. These investigations differ from general crimes investigations ... in several important respects. As a general rule, an investigation of a completed criminal act is normally confined to determining who committed that act and with securing evidence to establish the elements of the particular offense.... An intelligence investigation of an ongoing criminal enterprise must determine the size and composition of the group involved, its geographic dimensions, its past acts and intended criminal goals, and its capacity for harm. While a standard criminal investigation terminates with the decision to prosecute or not to prosecute, the investigation of a criminal enterprise does not necessarily end, even though one or more of the participants may have been prosecuted.
>
> In addition, the organization provides a life and continuity of operation that are not normally found in a regular criminal activity. As a consequence, these investigations may continue for several years. Furthermore, as Justice Powell noted, the focus of such investigations "May be less precise than that directed against more conventional types of crime."

*United States v. United States District Court,* 407 U.S. 297, 322, 92 S.Ct. 2125, 2139, 32 L.Ed.2d 752 (1972). Unlike the usual criminal case, there may be no completed offense to provide a framework for the investigation. It often requires the fitting together of bits and pieces of information many meaningless by themselves to determine whether a pattern of criminal activity exists. For this reason, the investigation is broader and less discriminate than usual, involving "the interrelation of various sources and types of information." *Id.*

> Members of groups or organizations acting in concert to violate the law present a grave threat to society. *An investigation of organizational activity, however, may present special problems particularly where it deals with politically motivated acts. "There is often a convergence of First and Fourth Amendment values," in such matters that is "not found in cases of 'ordinary' crime." Id. Thus special care must be exercised in sorting out protected activities from those which may lead to violence or serious disruption of society. As a consequence, the guidelines establish safeguards for group investigations of special sensitivity, including tighter management controls and higher levels of review.* (J.A. 83–84, italics supplied)

With respect to domestic security/terrorism investigations the guidelines explain that these deal with "enterprises, other than those involved in international terrorism, whose goals are to achieve political or social change through activities that involve force or violence." Like racketeering enterprise investigations, they are "concerned with the investigation of entire enterprises, rather than individual participants and specific criminal acts," and include "investigations to determine the structure and scope of the enterprise as well as the relationship of the members." (J.A. 87)

More specifically, the guidelines provide that:

A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States. The standard of "reasonable indication" is identical to that governing the initiation of a general crimes investigation.... In determining whether an investigation should be conducted, the FBI shall consider all of the circumstances including: (1) the magnitude of the threatened harm; (2) the likelihood it will occur; (3) the immediacy of the threat; and (4) the danger to privacy and free expression posed by an investigation. (J.A. 87–88)

With this context of the structure of the guidelines in view, we turn to the specific question addressed by the District Court: Whether in fact the new guidelines embody standards inconsistent with those established by the consent decree.

In reviewing the passage enjoined in the District Court's judgment, the District Court points out that: "Plainly read, the final sentence of the passage last quoted allows investigations when (1) the target 'advocate[s] criminal activity'; and (2) it is not 'apparent ... that there is no prospect of harm.'" [561 F.Supp. at 578]

The District Court then states that: "Much of the advocacy covered by this standard, however, falls within the protective shield of the First Amendment" and fails to comply with the teaching of *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

According to the District Court:

The standard embraced by the Reagan Guidelines is more lenient in three respects. First, under the Guidelines, the feared "harm" need not be, as it must under *Brandenburg*, "imminent." Second, and also contrary to *Brandenburg*, the feared "harm" need not be "likely." Finally, the speech need not be "directed" (*i.e.*, intended) to cause imminent, lawless action. [561 F.Supp. at 578]

These deviations from *Brandenburg* are not substantial. Indeed, were we construing the guidelines by themselves, without the guidance afforded by the consent decree and by the argument of government counsel, we should be tempted to suppose that the guidelines were substantially equivalent to the *Brandenburg* formulation, and constituted an attempt to paraphrase the traditional principle in operational bureaucratic prose.

As the District Court points out, paragraph 3.1 of the consent decree states that the settlement agreement "is entered into voluntarily by the parties, based on the ... [Levi] guidelines ... and on the understanding of them reflected in ¶ 2.2 ..." (J.A. 17).

Paragraph 2.2 of the consent decree indicates the view that "the Guidelines are not intended to permit domestic security investigations of groups which advocate the necessity for violent revolution at some time in the indefinite future, but which do not now engage in serious crimes or violence or advocate imminent serious crime or violence." (J.A. 12)

In other words, it was understood that the phrase "protected by the First Amendment" in paragraph 3.4 "incorporated the test enunciated in *Brandenburg*." 561 F.Supp. at 579.

Likewise at the argument in the case at bar government counsel rejected the suggestion that the *Brandenburg* standard and that set forth in the challenged Smith guidelines were substantially the same with a vigorous *thwertutnay*.[3]

---

**3.** According to John W. Davis, this term is an old English expression signifying an emphatic

Government counsel seek to escape *Brandenburg* as an authoritative precedent by arguing that it deals only with *punishment*, rather than with *investigation*. They contend that:

> The *Brandenburg* decision dealt with attempts by the state to punish speakers through criminal sanctions. The Reagan Guidelines, by contrast, deal only with the "more limited" power to investigate. Thus, according to the Government, an activity may be "protected" from punishment, but not from investigation. [561 F.Supp. at 379]

This ingenious distinction may or may not be true as a matter of constitutional law, but it has no impact on the case at bar, and like the District Court we do not pause to determine its validity.

█ The case at bar involves a proceeding to enforce the consent decree, not one to vindicate constitutional rights *per se.* The government may improvidently or as a matter of trial tactics have entered into a voluntary settlement of broader scope than what was required by the Constitution. And the subject matter of the consent decree was *investigations.* See paragraphs 1.4 and 3.5. If with respect to investigations they adopted the *Brandenburg* standards, it is immaterial that that case was not strictly speaking an applicable binding precedent. The then Attorney General's authority to enter into consent decrees included "the power to make erroneous decisions as well as correct ones," *Swift & Co. v. U.S.,* 276 U.S. 311, 332, 48 S.Ct. 311, 317, 72 L.Ed. 587 (1928), and, we might add, improvident as well as judicious ones.

For that matter, *Brandenburg* could be viewed as an inapplicable precedent, not only because it dealt with punishment rath-

er than investigation, but because it dealt with *State* rather than *federal* prosecution.

But this would be an equally fatuous distinction. The traditional principle which the consent decree derived from *Brandenburg* had been applied to the federal government in *Dennis.*[4] Since five verbose opinions were published in *Dennis,* it was natural to rely on the clearer statement in *Brandenburg,* even when referring to limitations on the activities of federal agencies such as the FBI. Indeed, the traditional principle involved in *Brandenburg* was nothing new. It was enunciated by Thomas Jefferson in the celebrated Virginia Act for Establishing Religious Freedom in these words: "it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order."[5] And the Supreme Court had declared that "Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order."[6]

█ Since the government has rejected the interpretation of the guidelines as paraphrasing the *Brandenburg* standards, and since there is therefore a violation of the settlement agreement which appellees are entitled by the terms thereof to enforce judicially, the judgment of the District Court must be affirmed, except with regard to the scope of relief granted.

█ We are not satisfied that an injunction against the offending passage of the guidelines is necessary. Recurring to what Justice Frankfurter often spoke of as "the traditional requisites of equity jurisdiction," the extraordinary remedy of injunc-

---

denial. "If the question warrants a negative answer, do not fence with it but respond with a bold *thwertutnay*—which for the benefit of the illiterate I may explain as a term used in ancient pleading to signify a downright No." John W. Davis, "The Argument of an Appeal," 26 Am.Bar Assn.J. (1940) 895, 897.

**4.** *Dennis v. U.S.,* 341 U.S. 494, 509–510, 71 S.Ct. 857, 867, 95 L.Ed. 1137 (1951), adopting the

formulation by Learned Hand in the court below.

**5.** 12 Hening, *The Statutes at Large* [of Virginia], 84–86 (1823).

**6.** *Reynolds v. U.S.,* 98 U.S. 145, 164, 25 L.Ed. 244 (1878). See also other cases cited in Dumbauld, *The Bill of Rights and What It Means Today* (1957) 111.

tion should not be resorted to unless there is lack of an adequate remedy at law and a sufficient showing of irreparable damage is made. The District Court (561 F.Supp. at 580) could "conceive of no meaningful way to calculate whatever damages might be due." But the injunction provided no pecuniary compensation to any plaintiff, and merely dealt with conduct *in futuro*. The government should be given the benefit of the *Brandenburg* doctrine which appellees espouse: unless there is substantial and imminent danger of action by the FBI violating the *Brandenburg* principle as embodied in the consent decree, an injunction is inappropriate, for there is no irreparable injury sustained by any plaintiff.

We do not believe that there is sufficient likelihood of such violations by the FBI in disregard of this Court's decision and of the provisions in the guidelines themselves, quoted hereinabove, recognizing the importance of the rule that "investigations not be based solely on activities protected by the First Amendment or on the lawful exercise of any other rights secured by the Constitution or laws of the United States," and calling for exercise of "special care" and "safeguards ... of special sensitivity, including tighter management controls and higher levels of review" in cases where there could be impact on such constitutionally "protected activities."

We note especially the specific provision, hereinabove quoted, from the guidelines which mandates (in terms reminiscent of the *Brandenburg-Dennis* principle) that the FBI "shall consider all of the circumstances including: (1) the magnitude of the threatened harm; (2) the likelihood it will occur; (3) the immediacy of the threat; and (4) the danger to privacy and free expression posed by an investigation." (J.A. 87–88).

We note also the clear statement of Director Webster that "These guidelines do not alter our clearly stated obligation to respect constitutional safeguards reflected especially in the First Amendment" (J.A. 129) and shall expect his review of the propriety of commencing and continuing investigations in "advocacy" cases to be in keeping with the obligation he has here enunciated. Moreover, the lack of need for an injunction is further reinforced by the terms of paragraph 3.6(c) of the consent decree. In substance this provision is self-operative, and has the effect of preventing the Reagan guidelines from going into effect in Chicago or superseding the provisions of Paragraph 3.5 as they stood prior to the new guidelines unless the new guidelines were consistent with Paragraph 3.4 of the consent decree.[7]

Accordingly we direct that the District Court retain continuing jurisdiction of the case at bar, so that if any occasion for future relief might arise the proceedings may be reinstated *in statu quo*, without unnecessary formalities or delays, to consider any supervening alleged violations.

The judgment of the District Court will be modified by striking out the passage granting injunctive relief, and as so modified and treated as a declaratory judgment interpreting the terms of the consent decree of August 11, 1981, will be

AFFIRMED.

POSNER, Circuit Judge, concurring and dissenting.

The district judge enjoined a provision of the new Department of Justice guidelines for FBI investigations as being inconsistent with a consent decree that terminated a suit which charged the FBI with abusing its investigatory powers by harassing political organizations in Chicago. The decree, and the injunction, are limited to Chicago. I agree with my brethren that the injunction should be set aside—but not that the district judge's interpretation of the con-

---

**7.** Paragraph 3.6 reads: "Any provision of Paragraph 3.5 shall be superseded by ...
(c) Any future ... guideline ...
Provided, that future ... guidelines ... shall be in accordance with the principles stated in Para-

graph 3.4, and the applicable provisions of federal statutes and the United States Constitution." J.A. 21–22.

sent decree should be affirmed. I both disagree with her interpretation and think she misused her equitable powers in not waiting till there was a concrete dispute between the parties before interpreting the decree.

Judge Dumbauld's opinion for this court is concise—one might say summary—and not without wit. I admire witty and concise opinions, remembering Holmes' adage that a judge doesn't have to be heavy in order to be weighty. But I question the appropriateness of treating the consent decree as if it were a contract between two flour dealers one of whom had "improvidently" agreed to the provision that the other is seeking to enforce, when in fact it is a federal court order circumscribing the FBI's investigative powers—and not with respect to particular individuals or groups but across the board, and not in some neighborhood or small town but in America's third-largest city, and at a time not of domestic tranquillity but of justifiable public anxiety about domestic as well as international terrorism. As a result of the district judge's interpretation of the decree, investigatory guidelines that have not been found to violate any constitutional or statutory provision will be operative everywhere in the nation except Chicago. And while it would be overly dramatic to suggest that as a result terrorist organizations will flock to Chicago, this specter should at least give us pause before we conclude that in the consent decree the FBI tied its hands to the extent found by the district judge.

Consent decrees are like contracts (see, e.g., *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *White v. Roughton*, 689 F.2d 118, 119–20 (7th Cir. 1982)), but the analogy should not be pressed to the point of ignoring the potential consequences of the plaintiffs' interpretation for the public safety. The Second Circuit observed in a case involving an attempt to enjoin the FBI from conducting surveillance of a convention of the Young Socialist Alliance that "while the possibilities of the dissident wing in SWP [the Socialist Workers Party] being able to gain

control and effectuate its desires to convert YSA into a violent movement may be less than the risks of serious student disorders in the late 1960's, the stakes are greater. The FBI has a right, indeed a duty, to keep itself informed with respect to the possible commission of crimes; it is not obliged to wear blinders until it may be too late for prevention." *Socialist Workers Party v. Attorney General*, 510 F.2d 253, 256 (2d Cir.1974) (per curiam). No more should the FBI be so obliged here.

It is true that the decree provides, under the heading of general principles, that "The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment . . . ." The district court and this court understand this to mean that the federal government has no greater power to investigate seditious, subversive, or otherwise menacing utterances than it has to punish criminally those who utter them. I disagree. Paying due regard to the latent issues of public safety in this appeal and reading the provision against the background of the original complaint, which alleged that the FBI had "conducted surveillance of and compiled dossiers on, [the] lawful political and other lawful activities" of the plaintiffs, *Alliance to End Repression v. City of Chicago*, 91 F.R.D. 182, 186 (N.D.Ill.1981), including such organizations as the American Civil Liberties Union and the American Friends Service Committee, I interpret the provision as merely prohibiting the FBI from conducting an investigation the object of which is to observe and thereby intimidate individuals or groups whose politics the FBI dislikes rather than to obtain evidence (or leads to evidence) of illegal conduct.

Suppose that a new organization calling itself the Islamic Revoluntionary Army announced that its goal was the violent overthrow of the United States as soon as con-

ditions permit. Standing alone the statement probably could not be made the basis for a prosecution. See *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam). Yet in these parlous times it would be simple prudence for the FBI to open a file on the IRA, to collect and collate public statements by and about it, to seek to discover (at least by nonintrusive means) who its members were, and to keep track of its activities until it was apparent that the IRA's aggressiveness was purely rhetorical. Such an investigation as I have described would not be based "solely on ... activities protected by the First Amendment"; its basis would be a concern with public safety in its most literal sense of preventing violence, even though the concern was triggered by a statement that was protected by the First Amendment from being made the basis of criminal punishment.

I grant that even the most discreet and least intrusive investigation—the investigation that consists of clipping newspaper stories and dropping them in a file—could if it ever came to light have some deterrent effect on the exercise of First Amendment rights. No one wants his name in an FBI investigative file. But the deterrent effect would be much less than that of an actual prosecution and would be offset by the public's interest in being protected from a more than theoretical danger of terrorist activity in this country and this city at this time. And the danger that the FBI might resort prematurely to such intrusive investigative methods as wiretapping, bugging, and breaking and entering is slight. The decree regulates those methods separately; and the new guidelines provide, "Before employing a[n investigative] technique, the FBI should consider whether the information could be obtained in a timely and effective way by less intrusive means. Some of the factors to be considered in judging intrusiveness are adverse consequences to an individual's privacy interests and avoidable damage to his reputation. Whether a highly intrusive technique should be used depends on the seriousness of the crime and the strength of the information indicating the existence of the crime. It is recognized that choice of technique is a matter of judgment." Despite the last sentence, this passage suggests that a preliminary, nonintrusive inquiry will usually precede an intrusive investigation—invariably I should think when the FBI's only basis for acting was a verbal threat to commit a crime in the indefinite future; how otherwise could the FBI gauge "the strength of the information indicating the existence of the crime"?

I have suggested that the part of the decree that is relevant to this appeal strikes the same balance as the First Amendment itself between public safety and freedom of speech. Statements which though ominous could not be made the basis of criminal punishment still can be investigated; since the repressive effect is less, a less immediate danger is adequate justification for the government action, as many cases teach. See, e.g., *Zurcher v. Stanford Daily*, 436 U.S. 547, 563–67, 98 S.Ct. 1970, 1980–82, 56 L.Ed.2d 525 (1978); *Heller v. New York*, 413 U.S. 483, 488–93, 93 S.Ct. 2789, 2792–95, 37 L.Ed.2d 745 (1973); *Branzburg v. Hayes*, 408 U.S. 665, 693–95, 92 S.Ct. 2646, 2662–63, 33 L.Ed.2d 626 (1972); *Reporters Comm. for Freedom of Press v. American Tel. & Tel. Co.*, 593 F.2d 1030, 1052 (D.C.Cir.1978). Against this it can be argued that if all the decree did was to incorporate the constitutional limitations on the FBI's investigatory activities, the plaintiffs gained nothing from signing it; the decree must therefore mean more. But the "solely on the basis of activities protected by the First Amendment" passage is only one provision of the decree. And just getting constitutional limitations written into a decree benefited the plaintiffs. It put the FBI in Chicago under threat of criminal contempt if it disobeys the Constitution. The FBI faces no equivalent sanction anywhere else in the country. Antitrust decrees typically repeat the prohibitions of the statute in order to add the sanction of contempt to the other

sanctions for disobeying the statute; it is the same here.

Having read "solely on the basis of activities protected by the First Amendment" to place more stringent limitations on the FBI's investigatory powers than the Constitution does, the district judge then found inconsistency between this provision and the part of the guidelines which states that, "In its efforts to anticipate or prevent crime, the FBI must at times initiate investigations in advance of criminal conduct. It is important that such investigations not be based solely on activities protected by the First Amendment .... When, however, statements advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence, an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances or context in which the statements are made, that there is no prospect of harm." The last sentence in this passage is the one the district judge enjoined. The scope of the injunction is unclear, however, because it is unclear whether the word "investigation" in the sentence means just a "full investigation" or includes "preliminary inquiries." If the former, then notwithstanding the injunction (converted by my brethren into a declaration) the FBI may conduct preliminary inquiries on the basis of "statements [that] advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence ...." I attribute the ambiguity in the district judge's injunction and this court's declaration to the lack of a concrete factual context for the interpretation of the decree (a point to which I shall return). But since the parties assume that "investigation" in the quoted passage runs the gamut from "full investigation" to "preliminary inquiry," I suppose I must assume too that after today the FBI may not use a statement not itself actionable as an incitement to violence to kick off any investigative activity in Chicago, however tentative, discreet, and unobtrusive. FBI agents presumably will still be allowed to file information in their minds, but if they write down anything they are investigating.

Unlike my brethren I find no inconsistency between the decree and the guidelines. The offending sentence of the guidelines does not state that an investigation "is" warranted under the postulated conditions, only that it may be warranted. To discover when an investigation is warranted you must go to the section of the guidelines that provides, "A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaging in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States.... In determining whether an investigation should be conducted, the FBI shall consider all of the circumstances including (1) the magnitude of the threatened harm; (2) the likelihood it will occur; (3) the immediacy of the threat; and (4) the danger to privacy and free expression posed by an investigation." Thus before the FBI may investigate it must assess the magnitude, likelihood, and imminence of the threatened harm from the activities to be investigated (and, as is evident from the first sentence in the quoted passage, the harm must be of a type that the government is entitled to prevent through its criminal laws); and then it must compare the results of this assessment—which is to say the benefits of investigating—with the costs in impairing privacy and free speech. It is fairly to be inferred that if the benefits do not exceed the costs the investigation will not be authorized. Thus the guidelines read as a whole authorize an investigation only when the expected danger to society from particular criminal activity exceeds the danger that the investigation poses to the values protected by the First Amendment. This balancing process adequately protects free speech and therefore does not violate a prohibition against the FBI's conducting investigations "solely on the basis of activities protected by the First Amendment."

Of course the balance might be struck incorrectly in a particular case. But if that happened the investigating officers, and their superiors who authorized the investigation, could not hide behind the guidelines; compliance with the guidelines is not a defense to a contempt proceeding for violating the decree. And in fact the plaintiffs have not been able to show—though the decree empowers them to monitor closely the FBI's compliance with it—that the FBI has conducted any investigation forbidden by the decree. Their only complaint is about the entirely speculative possibility that the guidelines, if interpreted by the FBI in such a way as to be inconsistent with the consent decree, may encourage the FBI to violate it and run the risk of contempt sanctions. And this would require a misinterpretation.

In saying that the new guidelines do not contravene anything in the consent decree I do not mean to suggest that I think the new guidelines an improvement over the old ones. I do not have the kind of experience that would enable me to opine confidently on such a question. For all I know the only enhancement of domestic security brought about by the new guidelines is rhetorical. What is ominous about the district judge's interpretation of the consent decree is that it prevents the FBI in Chicago, under any form of words, from conducting any investigation that is triggered by a statement that could not be punished as an incitement or solicitation to crime. This may force the FBI to wait too long before it can begin investigating threats to domestic security.

The fact that the plaintiffs' concerns about the new guidelines are speculative suggests a second objection to enjoining or declaring invalid any portion of the new guidelines at this time: prematurity. I do not mean that we lack jurisdiction to interpret the decree. The original lawsuit was justiciable. Although the mere existence of a government program for gathering political intelligence would not create the sort of injury, actual or threatened, upon which a federal court action can be founded, *Laird v. Tatum*, 408 U.S. 1, 13, 92 S.Ct.

2318, 2325, 33 L.Ed.2d 154 (1972), the plaintiffs alleged a scheme that included illegal wiretapping, burglaries, and other traditionally justiciable misconduct. Even if (improbably) the pure data-gathering part of the scheme would not be actionable even in combination with the other parts, an equity decree can "fence in" a wrongdoer by forbidding activities that would not by themselves support a federal court action. See, e.g., *FTC v. National Lead Co.*, 352 U.S. 419, 429–30, 77 S.Ct. 502, 509, 1 L.Ed.2d 438 (1957); *Larsen v. Sielaff*, 702 F.2d 116, 118 (7th Cir.1983). So the decree, even as addressed to nonintrusive investigations, was within the district court's power; and once the decree was entered, the district judge, having retained jurisdiction to supervise compliance with it, had, I should think, the power to interpret it at the request of a party even if there was no independently justiciable dispute over its application. Cf. *EEOC v. Safeway Stores, Inc.*, 611 F.2d 795, 798 (10th Cir.1979); Note, *Implementation Problems in Institutional Reform Litigation*, 91 Harv.L. Rev. 428, 440–48 (1977). But I question the wisdom of her exercising that power, in a case remote from the garden-variety type of equity suit in which interpretations normally are sought, before there was an actual threat to violate the decree and thus before there was a dispute over actions rather than just words.

When she originally approved the decree she had noted that the parties had "candidly admitted that they would not necessarily agree on all possible applications of the language of the principles in the abstract or in hypothetical cases," but she was "confident that in the context of concrete cases" she would be "able to perform the normal judicial function of reasonably interpreting the language to accomplish the purpose of the document as a whole.... All that is binding now is the language of the document; the only binding interpretations will be made later—by the Court—in the context of real disputes." 91 F.R.D. at 200. But she changed her mind, and decided not to wait for the FBI to conduct an

investigation that the plaintiffs would argue violated the decree. I have argued that there is no conflict between the decree and the guidelines, if these documents are read with appropriate sensitivity to purpose and context; but I also think it premature to decide whether there is any conflict. Not so premature as to deprive the district court or this court of jurisdiction to interpret the decree but premature from the standpoint of a prudent exercise of the equitable power of interpretation.

The country has grown accustomed to federal district judges' presiding over prison systems, school systems, and mental institutions, often pursuant to consent decrees. But to put a district judge in charge of the FBI in Chicago would write a new chapter in the annals of federal judicial enterprise, and though the decree does not go quite that far it does give the judge a great deal of power over the FBI in Chicago just by virtue of the inherent ambiguity of language—enough power to make her role in enforcing the decree an extraordinary one that if it is to be played well must be underplayed. A due regard for the separation of powers, the flexibility of equity, the ambiguity of the decree, the generality of the guidelines, the sensitivity and importance of the subject matter, and the limitations of judicial competence should have dissuaded her, and should dissuade us, from precipitating a premature confrontation between the judicial and executive branches in a setting where inevitably some people will say, with pardonable exaggeration, that the federal judiciary is playing fast and loose with the public safety.

I do not depreciate the abuses of police power that led to the decree, though it should be noted that they ended a decade ago and that much has changed since then—not only the management of the Bureau, whose present director is a former federal circuit judge, but the magnitude of the terrorist threat, which has increased. But we must remember that the FBI will continue subject to the decree until and unless it is modified; that the decree contains effective sanctions for disobeying it;

and that the new Department of Justice guidelines provide no immunity to anyone who disobeys it. Consequently there is no reason to rule, in advance of any questionable investigating by the FBI in Chicago—and there has been none since the decree went into effect—that a general provision of those guidelines violates a general principle of the consent decree. It should be quite enough to remind the Department that the consent decree remains in force until modified and that the Department's unilateral understanding of the decree, as embodied in its new guidelines, cannot bind the district judge should she be asked to punish disobedience of the decree by FBI agents engaged in an investigation forbidden by it. That the FBI in Chicago should operate under the pervasive constraints of a comprehensive consent decree is testament enough to the contemporary power of the federal judiciary. Let us be restrained in the exercise of that power.